## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CROWE CHIZEK AND COMPANY LLC, )<br>              )<br>      Plaintiff, )<br>              )<br>v.              )<br>              )<br>GUITAR CENTER, INC.    )<br>and MUSICIAN'S FRIEND, INC., )<br>              )<br>      Defendants. ) | NO. 07C 6128 |

## PLAINTIFF'S MEMORANDUM IN SUPPORT
## OF MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiff Crowe Chizek and Company LLC ("Crowe") brings this motion to stop defendants Guitar Center, Inc. ("Guitar Center") and its wholly-owned subsidiary, Musician's Friend, Inc. ("MFI"), from continuing to infringe Crowe's copyright in its proprietary E-Commerce Framework and Integration computer software program (the "Software"). Crowe has informed the defendants that they are using Crowe's Software without authorization or license, in violation of Crowe's exclusive rights under the Copyright Act, but the defendants have refused Crowe's demands that they cease their infringing activities. Crowe now asks that this Court enter an order enjoining the defendants from their continuing infringement.

One of the nation's leading business consulting organizations, Crowe has developed special expertise in creating e-commerce technology solutions for its clients. Drawing on its experience in more than 50 client engagements and its investment of millions of dollars in resources, Crowe used its unique Crowe Commerce Framework to build the Software for Dennis Bamber, Inc. ("DBI"), a retailer of musical instruments and accessories and the defendants'

predecessor in interest.  Crowe created the Software specifically for DBI to drive a network of e-commerce web sites, which allow customers to purchase musical instruments and related goods over the Internet.  In addition, the Software provides an extensive range of additional functions: it allowed DBI to process credit card payments, easily manage the content on its web sites, maintain and update its product catalog, manage system performance, track online visitor activity, and allow real-time access to manage inventory, among many other things.

Crowe developed the Software as an independent contractor and it owns all rights to it. After DBI filed for bankruptcy protection, the defendants acquired the Software, without license or permission, and began using it to power their e-commerce operations.  If the defendants had sought to develop a comparable system from scratch, it would have taken twelve to eighteen months, at a cost of hundreds of thousands of dollars.  Instead, they simply appropriated Crowe's Software and used it to drive more than $20 million in revenue and millions in profits.

Because the defendants have refused Crowe's demands that they cease using the Software, Crowe brought this action and now seeks this preliminary relief.

## FACTS

A.    Crowe Has Developed Special Expertise And
      Valuable Proprietary Software Frameworks For E-Commerce Web sites

Founded in 1942 as an accounting firm, Crowe has evolved into one of the nation's leading providers of business consulting services.  (Declaration of Paul Thomas ("Thomas Decl.,") ¶ 2)  Because businesses have traditionally been early adopters of computer technology in connection with their accounting functions – many of Crowe's clients began using computers in the early 1960s – Crowe found that its clients increasingly sought its advice and assistance in connection with computer systems and related technologies.  (*Id.*)  In response to this client demand, Crowe invested in developing a robust technology capability.  (*Id.*)

2

As business began to move onto the Internet and the World Wide Web in the 1990s, technology solutions became even more important to Crowe's clients. (Thomas Decl., ¶ 3) More than ten years ago, Crowe began creating and implementing electronic commerce software and systems to allow its clients to sell products and services over the Internet. (*Id.*) Crowe stayed at the forefront, developing advanced web site development tools and proprietary e-commerce software platforms that allowed clients not merely to sell over the web but also to track product inventory and system performance. (*Id.*) Drawing on its experience from more than ten years of development and more than 50 client projects, Crowe created its own e-commerce web site software, which can be used to build out a web site for a client 3 to 10 times faster than Crowe's competitors. (*Id.*) This advanced software also allows for extremely quick customization and integration into other systems and tools and reduces the cost of the project. (*Id.*) Crowe has developed proprietary database structures and extraction tools and its own formal methodology for implementing e-commerce web sites, which it uses to significantly reduce its client's project analysis and decision-making time. (Thomas Decl., ¶ 4) Thus, Crowe is able to create and deliver an advanced commerce web site 3 to 10 times faster than its competitors. (*Id.*)

B.    DBI Requires And Crowe Delivers An Advanced E-Commerce Platform

In 2003, Dennis Bamber, Inc. ("DBI"), approached Crowe to seek its expertise in developing an advanced e-commerce web site for its business. (Thomas Decl., ¶ 6) A for-profit music retail operation that conducted business through direct response catalogs and web sites, DBI realized that its web site was a fast-growing channel for future business. (*Id.*) DBI needed an e-commerce system that would give it better control of its web site – so that it would be easier to update the content on the site, manage its product catalog, and keep track of inventory and

3

product availability. Moreover, DBI did not own its web site and was concerned that it needed
~~to transition to a new web site quickly. (Id.)~~

In November 2005, DBI engaged Crowe to develop the Software for DBI's e-commerce
web sites and, after the Software was developed, to implement and service it. (Thomas Decl., ¶
7) The parties executed a Development Agreement that set forth the term of the engagement (the
"Agreement") (Id.; Complaint, Exhibit A) DBI explained to Crowe that it needed an
experienced organization that had the advanced tools to quickly build out their new commerce
web site. (Id.) According to DBI, it chose Crowe: because Crowe's advanced software and
technology included all necessary e-commerce functions including credit card processing,
content management, catalog management, system performance management, user tracking, and
many other functions; because Crowe could build and launch a new web site faster than other
vendors; and because Crowe's Software allowed DBI to convert quickly from DBI's existing web
site. (Id.)

DBI had a several requirements for the Software that Crowe was able to meet. First, DBI
required that the Software must provide an advanced e-commerce platform for several web sites,
including those branded as The Woodwind and Brasswind (www.wwbw.com) and Music123
(www.music123.com) (Thomas Decl., ¶ 8) The Woodwind and Brasswind brand primarily
targets band, orchestra, and combo instrument purchases. (Id.) The Music123 brand targets
purchases of guitars, keyboards, amplifiers, and pro audio and recording equipment. (Id.)

DBI also required that Crowe create Software that would integrate with DBI's specialized
enterprise resource planning ("ERP") system in a very distinct way, to allow DBI's employees
real time access to inventory status and availability while allowing physical stores to also
manage inventory. (Thomas Decl., ¶ 9) DBI wanted all of its various web sites to integrate into

a single back-end system had many commerce web sites and to operate all these web sites from a single back-end system. (*Id.*) Managing the user experience as well as the product and inventory of multiple web sites from a single system required highly advanced web site technology. (*Id.*) There were no off-the-shelf solutions available; Crowe needed to develop an advanced system that would integrate DBI's ERP system with a number of best of breed third party solutions for specialized content integration. (*Id.*)

Using its proprietary methodology, Crowe analyzed DBI's requirements and existing systems to develop and implement an e-commerce system that met DBI's needs. (Thomas Decl., ¶ 10) Crowe invested considerable time and creativity in identifying and solving the technical challenges, preparing functional specifications, creating a suitable architecture, preparing design documents, and writing the documentation for its solution. (*Id.*) Crowe personnel met with DBI employees frequently and regularly to document the scope of the project, create designs, and identify the necessary deliverables. (*Id.*) As a result of these meetings, Crowe prepared a detailed Project Charter that set forth the services, goals, deliverables and timetable for designing, developing, and implementing the Software (the "Project Charter") (Exhibit D attached hereto). (*Id.*) DBI reviewed and formally approved the Project Charter, designs, specifications, and requirements. (*Id.*)

Over the course of the project, Crowe encountered and overcame numerous challenges and obstacles, including, but not limited to:

- the technological challenge of using a single code base to support multiple e-commerce web sites with differing features and capabilities;

5

- the challenge of integrating the Software with newly-released third party
  ~~software, requiring Crowe to interface directly with the third party development~~
  team;

- integrating the Software with DBI's existing ERP system;

- integrating the Software with the highly specialized software of a credit card
  processing provider;

- at DBI's request, incorporating additional features and functions that were not
  originally within the scope of the Project Charter;

- taking over and completing tasks that DBI was contractually obligated but unable
  to provide; and

- acquiring familiarity with the software development tools for the Endeca software
  that DBI chose and was required but failed to provide.

(Thomas Decl., ¶ 11)

To meet these challenges and overcome these obstacles, Crowe built the Software on Crowe's unique Crowe Commerce Framework, which Crowe integrated with the necessary third party software and Crowe's content management system. (Thomas Decl., ¶ 12) Crowe had developed its Framework and development tools over the course of more than 50 client projects, representing an investment well over $10 million. (*Id.*) The Framework and development tools provide Crowe with a significant competitive advantage in the marketplace. (*Id.*) Written using Microsoft's .NET technology, the Software contains proprietary software code; proprietary data table structures, database, and database rules; and proprietary interface technology that allows the Software to integrate and communicate seamlessly with other systems and applications,

including the financial and operational systems that DBI used to support customer ordering and

~~fulfillment. (Thomas Decl., ¶ 13)~~

Crowe invested enormous resources to develop the Software for DBI. More than nine

Crowe employees worked to develop the Software, contributing more than 8,300 worker hours

from conception until DBI filed bankruptcy. (Thomas Decl., ¶ 14) It would take for another

software firm with a very large team of software developers from twelve to eighteen months to

create comparable substitute software from scratch. (*Id.*)

Crowe conducted a detailed and controlled acceptance testing phase. (Thomas Decl., ¶

15) Acceptance criteria were established in advance, agreed upon, executed, and formal

notification of acceptance was sent. (*Id.*) These were formally approved by DBI. (*Id.*)

Following acceptance, Crowe loaded the Software onto DBI's production environment

comprising 3 front end web servers, and 3 back end servers to support the web sites. (Thomas

Decl., ¶ 16) On our around July 30, 2006, DBI's web sites, including www.music123.com and

www.wwbw.com, went live and DBI began making online sales. (*Id.*)

Pursuant to the Agreement, Crowe provided additional development and related

consulting services in connection with the Software in response to three Requests for Services

signed by DBI, respectively, on August 29, 2006, September 19, 2006, and November 3, 2006.

(Complaint, Exhibit B; Thomas Decl., ¶ 17)

C.    Crowe Owns A Registered Copyright In The Software.

Crowe developed the Software as an independent contractor. (Agreement, ¶¶ 10, 13)

Under well-established principles of copyright law, therefore, Crowe owns the copyright in the

Software. Crowe had agreed to assign the ownership of the Software to DBI upon full payment

of "all fees" owed by DBI, (Agreement, ¶ 10), but that payment never happened because DBI

filed for bankruptcy.  (Thomas Decl., ¶ 18)  Accordingly, ownership of the software and the

~~copyright in it remained with Crowe.~~

Crowe registered the copyright in the Software with the United States Copyright Office,

which duly issued Registration No. TXu 1-569-001 (Exhibit C, attached hereto).

D.    After DBI Files For Bankruptcy, The Defendants Obtain
      And Use The Software Without Authorization Or License

On November 21, 2006, DBI filed a Voluntary Petition for Relief under Chapter 11 of the

United States Bankruptcy Code, in an action commenced in the United States Bankruptcy Court

in the Northern District of Indiana (the "Bankruptcy Court"), *In re: Dennis Bamber, Inc. d/b/a*

*The Woodwind & Brasswind*, Case No. 06-31800 (the "Bankruptcy Case").  At the time that DBI

filed for bankruptcy protection, it owed Crowe more than $320,000 in unpaid fees under the

Agreement and related Requests.  (Thomas Decl., ¶ 18)  There is no dispute that Crowe

performed the development services; DBI confirmed the debt on Schedule F of its schedule of

assets and liabilities.  There, DBI identified Crowe as a creditor and noted that its unsecured

claim in the amount of $320,296.69 was uncontested.  (Schedule F is attached hereto as Exhibit

E.)

On January 30, 2007, the Bankruptcy Court entered an order approving the sale of

substantially all of DBI's assets to Guitar Center's subsidiary, MFI.  (The Order and Asset

Purchase Agreement are attached hereto as Exhibit F.)  The Software was <u>not</u> among the assets

transferred to MFI.  DBI chose not to assume the Agreement; it was therefore deemed rejected

and Crowe was not paid.  Consequently, Crowe retained all right, title, and interest in and to the

Software.  Crowe was and remains the sole and exclusive holder of the copyright in the

Software.

8

Nevertheless, on February 9, 2007, Guitar Center and MFI began to operate the web sites

~~run by Crowe's Software. The defendants had no right or license to use the Software, but they~~

used it anyway, in disregard of Crowe's exclusive rights under Section 106 of the Copyright Act.

In late August, 2007, Crowe observed that DBI brands still were being marketed and discovered

that the web sites powered by Crowe's software were still operational on defendants' web sites,

including www.wwbw.com; www.music123.com; www.4lyons.com; www.guitarsale.com; and

www.musicalsandbox.com. (Thomas Decl., ¶ 19)  Crowe has analyzed these web sites; they use

the Software. *(Id.)*  Specifically, Crowe developers reviewed the HTML code of the active

server pages ("aspx pages") that are served by Guitar Center's web servers and downloaded to a

user's browser and they compared that code to the HTMLcode that Crowe had created for DBI

using the Crowe web site development tools. *(Id.)*  The code from the Guitar Center web sites

was largely identical to the code created by Crowe and delivered to DBI. *(Id.)*  From this

analysis, it is evident that following Guitar Center's purchase of DBI's assets, Guitar Center

simply took over the DBI web site servers on which the Software had been installed and

continued to operate these web sites. *(Id.)*

In addition, Crowe's analysis of the code revealed that Guitar Center had made some

changes and modifications to the Software. (Thomas Decl., ¶ 20)  The Music123 web site has

been updated with Christmas images, for instance, and there have been other modifications that

could only be made using the proprietary and copyrighted software tools developed by Crowe.

*(Id.)*  These changes and modifications also reveal that Guitar Center must have granted access to

the Software to other software developers to allow them to modify the web sites and Crowe

tools. *(Id.)*  Crowe has been informed that Guitar Center has engaged third party software

developers to modify the Crowe Software and the www.wwwbw.com and www.music123.com

web sites, thereby providing Crowe's competitively sensitive, confidential, and trade secret

~~technical information to Crowe's competitors.  (Id.)  It also appears that Guitar Center has been~~

taking some of the innovative programming features that Crowe built into the Software and

migrating those features to other Guitar Center web sites.  (Id.)

       Upon discovering that defendants were making infringing use of the Software, Crowe

contacted Guitar Center and MFI, informed them of Crowe's exclusive right to the copyright in

the Software, and demanded that they cease and desist their infringement.  (Thomas Decl., ¶ 21)

The defendants refused.  They have not denied that they possess and use Crowe's Software.

(Thomas Decl., ¶22)  They simply continued, and to this day still continue, to use the Software,

deriving enormous revenues from the online commerce that the Software enables, all in violation

of Crowe's rights under the Copyright Act.


## ARGUMENT

### I.    CROWE IS ENTITLED TO A PRELIMINARY INJUNCTION

       Crowe is entitled to preliminary injunctive relief if it establishes:

       (1)     some likelihood of success on the merits;

       (2)     irreparable harm for which there is no adequate remedy at law;

       (3)     the balance of hardships weighs in Crowe's favor; and

       (4)     the injunction will not disserve the public interest.

*Erickson v. Trinity Theater, Inc.,* 13 F.3d 1061, 1067 (7th Cir. 1994); *Atari, Inc. v. North*

*American Philips Consumers Electronics Corp.*, 672 F.2d 607, 613 (7th Cir. 1982), *cert. denied,*

459 U.S. 880 (1982).

A.    Crowe Will Likely Succeed on the Merits

~~Crowe can readily demonstrate a strong likelihood of success on the merits.  To prevail~~

on its claim of copyright infringement, Crowe needs only to show that it owns a valid copyright

in the Software and that defendants have used, copied or otherwise infringed Crowe's §106

exclusive rights in the Software. *Atari, Inc.*, 672 F.2d at 614; *JCW Investments, Inc. v. Novelty,*

*Inc.*, 482 F.3d 910, 914 (7th Cir. 2007).

1.    Crowe Has Registered the Copyright In the Software

Crowe's copyright registration (Exhibit C) constitutes *prima facie* evidence of the

validity of Crowe's copyright and satisfies its burden of proving a valid copyright.  17 U.S.C.

§410(c); *JCW Investments*, 482 F.3d at 914-15; *Wildlife Express Corporation v. Carol Wright*

*Sales, Inc.*, 18 F.2d 502, 507 (7th Cir. 1994); *Computer Assocs. Int'l v. Quest Software, Inc.*, 333

F. Supp. 2d 688, 697 (N.D. Ill. 2004).

2.    Defendants Are Infringing Crowe's Copyright By Using the Software

Under Section 106 of the Copyright Act, a copyright owner has the exclusive rights to

reproduce the work, prepare derivative works, and distribute copies of the work.  17 U.S.C.

§106.  Here, Crowe can establish copying by showing that (1) defendants had access to the

Software; and (2) defendants are using the Software without authorization.  *Roulo v. Russ Berrie*

*& Co., Inc.,* 886 F.2d 931, 939 (7th Cir. 1989); *Atari, Inc.*, 672 F.2d at 614; *ISC-Bunker Ramo*

*Corp.*, 765 F. Supp. at 1332.  In the software context, use is copying.  To use software it must be

loaded into a computer's memory.  Loading creates a copy of the software on the hard drive of

the computer and in its random access memory (or "RAM").  Those copies are a direct

infringement of the copyright owner's exclusive right to reproduce the work.  *ISC-Bunker Ramo*

*Corp. v. Altech, Inc.,* 765 F. Supp. 1310, 1332 (N. D. Ill. 1990) ("whenever Altech uses ISC's

copyrighted software, it necessarily makes an unauthorized copy of that software, and

~~necessarily infringes ISC's copyright.").~~ *~~See also MAI Sys. Corp. v. Peak Computer, Inc., 991~~*

F.2d 511, 517 (9th Cir. 1993) ("This allowed use necessarily includes the loading of the software

into the computer's random access memory."). Thus, use of software without authorization is

copyright infringement. *See id.* at 518 ("The law also supports the conclusion that [the

defendant's] loading of copyrighted software into RAM creates a 'copy' of that software in

violation of the Copyright Act.").

Here, there can be no dispute that Guitar Center and MFI have copied the Software. To

use the Software to power their e-commerce websites, they must have installed – that is, copied –

the Software onto the hard drives and into the memory of each server that hosts the websites.

DBI's production environment comprised 3 front end web servers, and 3 back end servers to

support the web sites (Thomas Decl., ¶ 16). Given the size of Guitar Center's and MFI's e-

commerce operations, they likely have either simply taken over the 6 DBI servers or installed the

Software into at least 6 servers. (Thomas Decl., ¶ 19) Each copy is an infringement. *ISC-*

*Bunker Ramo Corp.,* 765 F. Supp. at 1332; *MAI Sys. Corp.* 991 F.2d at 518 ("The law also

supports the conclusion that [the defendant's] loading of copyrighted software into RAM creates

a 'copy' of that software in violation of the Copyright Act."). Tellingly, defendants have never

denied either possession or use of the Software. (Thomas Decl., ¶ 22).

Crowe can demonstrate both a valid copyright and defendants' unauthorized use – the

two elements of copyright infringement. Therefore, Crowe is very likely to succeed on its

copyright claim.

B.    Irreparable Harm

In a copyright infringement action, once a showing of likelihood of success on the merits

is made, irreparable injury to the plaintiff is presumed. *Atari, Inc.*, 672 F.2d at 620; *JCW*

*Investments, Inc.*, 222 F. Supp. 2d at 1036. Further, the greater the likelihood of success on the

merits, the less irreparable harm must be shown. *Ty, Inc. v. GMA Accessories, Inc.,* 132 F. 3d

1167, 1172 (7th Cir. 1997).

A copyright is uniquely valuable property, so unique and valuable that when there is a

showing of infringement, the law presumes injury, and presumes that the injury is irreparable.

*Atari, Inc.*, 672 F.2d at 620; *JCW Investments, Inc.*, 222 F. Supp. 2d at 1036 (noting that the

plaintiff "does not need to market a competing product in order to demonstrate irreparable

harm."). But the injury to Crowe, while presumed, is very real. The defendants' use and

creation of derivative copies of the Software are causing actual irreparable harm to the

substantial investment Crowe has made in creating the Software and to the present and future

economic value of the Software in a manner incapable of being remedied adequately through

monetary relief.

Further, defendants have disclosed Crowe's confidential proprietary Software to

competitors of Crowe in Crowe's markets. (Thomas Decl., ¶ 20) This disclosure affords a

significant benefit to Crowe's competitors who can learn Crowe's trade secrets, use Crowe's

advanced tools and cause significant harm to Crowe. *Computer Assocs. Int'l,* 333 F. Supp. 2d at

701.

The defendants, by contrast, will suffer no harm if they are enjoined from offering or

distributing the Software because they have no right to infringe the copyright. The court should

give "little equitable consideration" to any complaint about the economic harm that the

defendants might suffer if they are enjoined from using the Software when they knowingly relied

upon infringing activities as daily aspect of their business. *Atari, Inc.*, 672 F.2d at 620; *ISC-*

*Bunker Ramo Corp.*, 765 F. Supp. at 1332. The balance of harms does not favor an infringer

even if its business would be "virtually destroyed by a preliminary injunction." *Concrete*

*Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988). As the First

Circuit observed:

> [i]t would be incongruous to hold that the more an enterprise relies on copyright
> infringement for survival, the more likely it will be able to defeat the copyright
> owner's efforts to have that activity immediately halted. We see little reason why
> an entity should be allowed to establish and continue an enterprise based solely on
> what is in all likelihood copyright infringement, simply because that it is its only
> business.

*Id.* To hold otherwise would give infringers free rein to build their businesses based upon others'

intellectual property. *Id.*

C.    The Public Interest

The public interest in protecting original works of authorship is served by the issuance of

an injunction against the infringing use of a work. As stated in *Apple Computer, Inc. v. Franklin*

*Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983):

> Since Congress has elected to grant certain exclusive rights to the
> owner of a copyright in a protected work, it is virtually axiomatic
> that the public interest can only be served by upholding copyright
> protections and, correspondingly, preventing the misappropriation
> of the skills, creative energies, and resources which are invested in
> the protected work.

*Accord, Atari, Inc.*, 672 F.2d at 620.

D.    Balance of Hardships

The balance of harm weighs decidedly in Crowe's favor. Crowe owns a unique and

valuable copyright in the Software that is critical to its business. Guitar Center has used Crowe's

Software without permission; put bluntly, the defendants have effectively stolen Crowe's

Software.  Unless the relief is granted, Crowe will continue to be damaged by defendants' unauthorized use of the Software.  Defendants, on the other hand, are profiting from their infringement of Crowe's copyrighted Software and will not be precluded by the requested relief from engaging in any lawful business.  *Helene Curtis Industries v. Church & Dwight Co.*, 560 F.2d 1325, 1333-34 (7th Cir. 1977).  As stated in *Atari, Inc.*, 672 F.2d at 620, "advantages built upon a deliberately plagiarized make-up do not seem to us to give the borrower any standing to complain that his vested interest will be disturbed."  Defendants, in fact, sell merchandise in many different ways, so that, only one aspect of their business will be impacted.  *Stanislawski*, 337 F. Supp. 2d at 1118.

## II.    CONCLUSION

There is no serious dispute about the central facts of this case.  Crowe owns a registered copyright in its Software, and Guitar Center and MFI are using the Software without Crowe's authorization.  Crowe has shown that defendants are infringing the copyright in the Software, that defendants' continuing infringement will cause Crowe irreparable harm, and that the balance of equities strongly favors the entry of an injunction against the defendants' further infringement Crowe's software.  Crowe is entitled to an immediate order preliminarily enjoining Guitar Center against further infringement, in the form of the accompanying Proposed Order.

Respectfully submitted,

CROWE CHIZEK AND COMPANY LLC

By: _____
           One of its attorneys

Robert J. Labate (no. 6184945)
Peter J. Strand (no. 6196727)
HOLLAND & KNIGHT LLP
131 S. Dearborn St., 30th Floor
Chicago, IL 60603
(312) 263-3600
Firm ID No. 37472

Dated:        November 16, 2007
               Chicago, Illinois

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

~~CROWE CHIZEK AND COMPANY LLC,~~ )
                                   )
                    Plaintiff,     )
                                   )
v.                                 )        NO. 07C 6128
                                   )
GUITAR CENTER, INC.                )
and MUSICIAN'S FRIEND, INC.,       )
                                   )
                    Defendants.    )

## ORDER ON PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

The Court, having considered the motion of plaintiff, Crowe Chizek and Company LLC,

("Crowe") for a Preliminary Injunction, its Memorandum in support thereof, and all other

materials of record and arguments presented by the parties, hereby finds that:

### Findings of Fact

1.      Crowe created the Ecommerce Framework and Integration computer software

program (the "Software") and owns all right, title, and interest to the copyright in the Software.

Crowe registered the copyright in the Software with the United States Copyright Office, which

duly issued Registration No. TXu 1-569-001.

2.      In January 2005, Dennis Bamber, Inc. ("DBI") engaged Crowe to develop the

Software for DBI's Ecommerce websites and to implement and service the Software for DBI (the

"Agreement"). Crowe designed the Software, which is currently used to operate Ecommerce

websites originally run by DBI beginning on or around July 30, 2006, and now run by Guitar

Center and MFI. Such websites include www.music123.com and www.wwbw.com. Pursuant to

the Agreement, Crowe provided additional development and related consulting services in

connection with the Software in response to three Requests for Services (the "Requests") signed

~~by DBI, respectively, on August 29, 2006, September 19, 2006, and November 3, 2006.~~

3.    Because Crowe performed services as an independent contractor, it was the author and owner of the copyright in the Software. In the Agreement, Crowe agreed to assign its ownership of the copyright in the Software after DBI had paid all fees owed to Crowe.

4.    On November 21, 2006, DBI filed a Voluntary Petition for Relief under Chapter 11 of the United States Bankruptcy Code, in an action commenced the United States Bankruptcy Court in the Northern District of Indiana (the "Bankruptcy Court"), *In re: Dennis Bamber, Inc. d/b/a The Woodwind & Brasswind*, Case No. 06-31800 (the "Bankruptcy Case").

5.    At the time that DBI filed for bankruptcy in November, 2006, DBI owed Crowe more than $320,000 in unpaid fees under the Agreement and related Requests, and in Schedule F of DBI's schedule of assets and liabilities, DBI listed Crowe as a creditor holding an uncontested, unsecured claim in the amount of $320,296.69.

6.    On or about January 30, 2007, the Bankruptcy Court entered an order approving the sale of substantially all of DBI's assets to Guitar Center's subsidiary, MFI. One of the assets that DBI did not transfer to MFI was the Agreement and DBI's potential interest in the Software.

7.    Because DBI failed to "assume" the Agreement in the Bankruptcy Case and assign such agreement to Guitar Center in connection with the sale of DBI assets, the Agreement was not transferred to MFI and was deemed "rejected" in the Bankruptcy Case. Accordingly, Crowe retained all right, title, and interest in and to the Software and Crowe was and remains the sole and exclusive holder of the copyright in the Software.

8.    Defendants obtained copies of the Software as a result of their purchase of DBI's assets and began to use it after February 9, 2007.

2

9.    Defendants have continued to use and make copies of Crowe's Software without

Crowe's authorization or license.

### Conclusions of Law

1.    Crowe owns a duly registered copyright in its Software, as evidenced by Certificate of Registration No. TXu 1-569-001.

2.    Crowe has demonstrated a substantial likelihood that defendants are infringing its copyright in the Software.

3.    Crowe has demonstrated that it will suffer irreparable harm from defendants' infringing activity.

4.    Crowe has demonstrated that the balance of harms and the public interest favor the entry of an injunction against defendants' continuing infringement.

Accordingly, the Court hereby **ORDERS** that:

1.    Pursuant to 17 U.S.C. §§ 502 and 503, defendants, their officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with defendants, are hereby preliminarily enjoined and restrained from

      a.    using Crowe's Software;

      b.    making any copies of the Software; and/or

      c.    otherwise engaging in any activity constituting an infringement of

Crowe's exclusive rights in the Software or federally registered copyright number TX-3-306-941 until such time that this Court orders otherwise.

**IT IS SO ORDERED.**

_____
Rebecca R. Pallmeyer,
United States District Judge

Dated: November ___, 2007

# 4944051_v1

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CROWE CHIZEK AND COMPANY LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 07C 6128 |
| ) | |
| GUITAR CENTER, INC. ) | |
| and MUSICIAN'S FRIEND, INC., ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF PAUL THOMAS

I, Paul Thomas, hereby state and declare the following:

1.      I am an Executive with Crowe Chizek and Company LLC ("Crowe"). I have held this position since 1992. I am familiar with the facts set forth below as a result of personal knowledge or a review of business records of Crowe.

2.      Crowe provides business consulting services, including software development and implementation services, such as the development of electronic commerce software and systems, that allow Crowe's clients to sell products and services over the Internet. Crowe was founded in 1942 as an accounting firm. Business functions such as accounting have traditionally been areas of early adoption of computer technology and many of Crowe's clients began using computers in the early 1960's. As clients became more dependent on technology, they turned to their accounting firms for professional advice and technology assistance.

3.      As business began to move onto the Internet and the World Wide Web in the 1990s, technology solutions became even more important to Crowe's clients. More than ten years ago, Crowe began creating and implementing electronic commerce software and systems to allow its clients to sell products and services over the Internet. Crowe stayed at the forefront,

developing advanced web site development tools and proprietary e-commerce software platforms that allowed clients not merely to sell over the web but also to track product inventory and system performance. Drawing on its experience from more than ten years of development and more than 50 client projects, Crowe created its own e-commerce web site software, which can be used to build out a web site for a client 3 to 10 times faster than Crowe's competitors. This advanced software also allows for extremely quick customization and integration into other systems and tools and reduces the cost of the project.

4.      Additionally, Crowe has developed proprietary database structures and extraction tools and its own formal methodology for implementing commerce web sites. Crowe has used this advance methodology to significantly reduce its client's analysis and decision making time. Thus, Crowe is able to create and deliver an advanced commerce web site 3 to 10 times faster than its competitors.

5.      Crowe created and owns the exclusive rights to the Software. Crowe registered the copyright in the Software with the United States Copyright Office, which duly issued Registration No. TXu 1-569-001.

6.      Near the end of 2003, Crowe bid on an enterprise resource planning ("ERP") system, strategy and selection study for Dennis Bamber, Inc. ("DBI"), a for-profit music retail operation that conducted business through direct response catalogs and web sites. Crowe did not win that contract. However, after having selected another vendor, DBI's ERP project failed. After having spent over One Million Dollars, DBI was frustrated with its ERP vendor as well as its commerce web site. DBI realized that the web site was a fast growing channel for future business and it needed better control of its commerce web site as well as flexibility to change the site. At that time, DBI did not own its web site and was concerned that it needed to transition to a new web site quickly.

2

7.    In November 2005, DBI engaged Crowe to develop, implement and service the

~~Software for DBI's e-commerce web sites.  The parties executed a Development Agreement~~

which set forth the term of the engagement (the "Agreement").  DBI needed an experienced

organization with advanced tools to quickly build out their new commerce web site and chose

Crowe: because of its advanced Software which included all necessary e-commerce functions

including but not limited to credit card processing, content management, catalog management,

system performance management, user tracking, and many other functions; because Crowe could

build and launch a new web site faster than other vendors; and because Crowe's Software

allowed DBI to convert quickly from DBI's existing web site.

8.    DBI needed the Software to provide an advanced e-commerce platform for its

several web sites including those branded as The Woodwind and Brasswind and Music123.  The

Woodwind and Brasswind brand primarily targets and markets to band, orchestra, and combo

instrument purchases.  The Music123 brand targets and markets to purchasers of guitars,

keyboards, amplifiers, and pro audio and recording equipment.

9.    DBI also required that Crowe create Software that would integrate with DBI's

specialized ERP system in a very distinct way to allow DBI's employees real time access to

inventory status and availability while allowing physical stores to also manage inventory.  DBI

also wanted all of its various web sites to integrate into a single back-end system with many

commerce web sites and to operate all these web sites from a single back-end system.  Managing

the user experience as well as the product and inventory of multiple web sites from a single

system required highly advanced web site technology.  There were no off-the-shelf solutions

available; Crowe needed to develop an advanced system that would integrate DBI's ERP system

with a number of best of breed third party solutions for specialized content integration.

10.     Using its proprietary methodology, Crowe analyzed DBI's requirements and existing systems to develop and implement an e-commerce system that met DBI's needs. Crowe invested considerable time and creativity in identifying and solving the technical challenges, preparing functional specifications, creating a suitable architecture, preparing design documents, and writing the documentation for its solution. Crowe personnel met with DBI employees frequently and regularly to document the scope of the project, create designs, and identify the necessary deliverables. As a result of these meetings, Crowe prepared a detailed Project Charter that set forth the services, goals, deliverables and timetable for designing, developing, and implementing the Software (the "Project Charter") (Exhibit D attached hereto). DBI reviewed and formally approved the Project Charter, designs, specifications, and requirements.

11.     Over the course of the project, Crowe encountered and overcame numerous technological challenges and obstacles, including, but not limited to:

- using a single code base to support multiple e-commerce web sites with differing features and capabilities;

- integrating the Software with newly-released third party software, requiring Crowe to interface directly with the third party development team;

- integrating the Software with DBI's existing ERP system;

- integrating the Software with the highly specialized software of a credit card processing provider;

- incorporating, at DBI's request, additional features and functions that were not originally within the scope of the Project Charter;

- taking over and completing tasks that DBI was contractually obligated but unable to provide; and

4

- acquiring familiarity with the software development tools for the Endeca software that DBI chose and was required but failed to provide.

12.    To meet these challenges and overcome these obstacles, Crowe built the Software using Crowe's unique Crowe Commerce Framework with integration with third party software and Crowe's content management system.  Crowe developed its Framework and developmental tools over the course of more than 50  client projects, representing an investment well over $10 million.  The Framework and development tools provide Crowe with a significant competitive advantage in the marketplace.

13.    Written using Microsoft's .NET technology, the Software contains proprietary software code; proprietary data table structures, database, and database rules; and proprietary interface technology that allows the Software to integrate and communicate seamlessly with other systems and applications, including the financial and operational systems that DBI used to support customer ordering and fulfillment.

14.    More than nine Crowe employees worked on the Software contributing more than 8,300 worker hours from conception until DBI filed bankruptcy.  It would take for another software firm with a very large team of software developers to create a comparable product from 12 to 18 months to create substitute software from scratch.

15.    There was a detailed and controlled acceptance testing phase.  Acceptance criteria were established in advanced, agreed upon, executed, and formal notification of acceptance was sent.  These were formally approved by DBI.

16.    Crowe designed the Software and loaded the Software onto DBI's production environment comprising 3 front end web servers and 3 back end servers to support the web sites.  On or around July 30, 2006 DBI's web sites, including www.music123.com and www.wwbw.com, went live and DBI began online sales.

17.    Pursuant to the Agreement, Crowe provided additional development and related consulting services in connection with the Software in response to three Requests for Services signed by DBI, respectively, on August 29, 2006, September 19, 2006, and November 3, 2006.

18.    At the time that DBI filed bankruptcy case, it owed Crowe more than $320,000 in unpaid fees under the Agreement and related Requests.

19.    In late August, 2007, Crowe observed that DBI brands still were being marketed on defendants' web sites (www.wwbw.com; www.music123.com; http://www.4lyons.com/; http://www.guitarsale.com/; and http://www.musicalsandbox.com/. Crowe reviewed and analyzed these web sites and confirmed that defendants are using the Software. Crowe developers reviewed the HTML code of the active server pages ("aspx pages") that are served by Guitar Center's web servers and downloaded to a user's browser and they compared that code to the HTMLcode that Crowe had created for DBI using the Crowe web site development tools. The code from the Guitar Center web sites was largely identical to the code created by Crowe and delivered to DBI. From this analysis, it is evident that following Guitar Center's purchase of DBI's assets, Guitar Center simply took over the DBI web site servers on which the Software had been installed and continued to operate these web sites.

20.    Crowe's analysis of the code also revealed that Guitar Center had made some changes and modifications to the Software. The Music123 web site has been updated with Christmas images, for instance, and there have been other modifications that could only be made using the proprietary and copyrighted software tools developed by Crowe. These changes and modifications also reveal that Guitar Center must have granted access to the Software to other software developers to allow them to modify the web sites and Crowe tools. In fact, Crowe has been informed that Guitar Center has engaged third party software developers to modify the Crowe Software and the www.wwwbw.com and www.music123.com web sites, thereby

providing Crowe's competitively sensitive, confidential, and trade secret technical information to Crowe's competitors. It also appears that Guitar Center has been taking some of the innovative programming features that Crowe built into the Software and migrating those features to other Guitar Center web sites.

21.     Crowe informed Guitar Center and MFI of their infringement of Crowe's registered copyright in the Software and demanded that the defendants cease and desist their infringement. However, defendants simply continued to infringe the Software, deriving significant benefits from their infringing activities. These wrongful benefits include the revenue from online sales that are made possible by Crowe's Software.

22.     Guitar Center and MFI have not denied possession or use of Crowe's Software or making copies of the Software on their computer systems without license, assignment, or other authorization from Crowe.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 15th day of November, 2007, at Indianapolis, Indiana.

Paul Thomas

# 4917828_v2

7

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CROWE CHIZEK AND COMPANY LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    NO. 07C 6128 |
| | ) |
| GUITAR CENTER, INC. | ) |
| and MUSICIAN'S FRIEND, INC., | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF FILING

To:

Guitar Center, Inc.
5795 Lindero Canyon Road
Westlake Village, CA 91362

Musician's Friend, Inc.
931 Chevy Way
Medford, OR 97504

Peter M. Gilhuly, Esq
Latham & Watkins LLP
633 W. 5th Street, Suite 4000
Los Angeles, CA 90071

**PLEASE TAKE NOTICE** that on November 16, 2007, we electronically filed with the Clerk of

the United States District Court, Northern District of Illinois, Eastern Division, 219 South

Dearborn Street, Chicago, Illinois, Plaintiff's Motion for Preliminary Injunction and Plaintiff's

Memorandum in Support of Motion for Preliminary Injunction, copies of which are attached

hereto and hereby served upon you.

Respectfully Submitted,

**CROWE CHIZEK AND COMPANY LLC**

By: _____
One of its attorneys

Robert J. Labate  (no. 6184945)
Peter J. Strand (no. 6196727)
HOLLAND & KNIGHT LLP
131 S. Dearborn St., 30th Floor
Chicago, IL  60603
(312) 263-3600
Firm ID No. 37472
Dated: November 16, 2007
Chicago, Illinois

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that copies of **Plaintiffs' Motion for Preliminary Injunction** and **Plaintiff's Memorandum in Support of Motion for Preliminary Injunction** were served upon:

| | | |
|---|---|---|
| Guitar Center, Inc. | Musician's Friend, Inc. | Peter M. Gilhuly, Esq |
| 5795 Lindero Canyon Road | 931 Chevy Way | Latham & Watkins LLP |
| Westlake Village, CA  91362 | Medford, OR  97504 | 633 W. 5th Street, Suite 4000 |
| | | Los Angeles, CA  90071 |

Via U.S. Mail, postage prepaid, from 131 S. Dearborn Street, Chicago, Illinois, 60603, on the 16th day of November, 2007.

_____
Peter J. Strand

**Exhibit List**

**to Plaintiff Crowe Chizek and Company LLC's Preliminary Injunction**

Exhibit A (to Complaint)……………………..….Development Agreement: the "Agreement"

Exhibit B (to Complaint)…..…………………………….Requests for Services: the "Requests"

Exhibit C………………………………………………….Certificate of Copyright Registration

Exhibit D………………………………………………………………………... Project Charter

Exhibit E…………………………………...………………………………………...Schedule F

Exhibit F…………………………………………….Order and Asset Purchase Agreement