obligation of Purchaser or Seller to pay any finder's fee, brokerage commission, legal, accounting or similar payment in connection with the transactions contemplated hereby.

3.20 No Other Agreements to Sell the Transferred Assets. Seller has no legal obligation, absolute or contingent, to any other Person to sell the Transferred Assets or any portion thereof or to sell any capital stock of Seller or to effect any merger, consolidation or other reorganization of Seller or to enter into any agreement with respect thereto, except pursuant to this Agreement.

3.21 Product Liability. To the knowledge of Seller, Seller has not committed any act, and there has been no omission by Seller, which is reasonably likely to result in, and there has been no occurrence relating to any product of Seller which is reasonably likely to result in, product liability (whether covered by insurance or not) on the part of Seller, with respect to products distributed, delivered or sold by Seller prior to the Closing.

3.22 Approvals. Section 3.22 of the Disclosure Schedule contains a list of all material approvals or consents relating to the Business which are required to be given to or obtained by Seller from any Person in connection with the consummation of the transactions contemplated by this Agreement, it being acknowledged that the consents related to the continued use of the Key Software Licenses shall be deemed material.

## ARTICLE 4
## PURCHASER'S REPRESENTATIONS AND WARRANTIES

As an inducement of Seller to enter into this Agreement, Purchaser hereby makes the following representations and warranties to Seller.

4.1 Organization. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with full corporate power and authority to conduct its business as presently being conducted.

4.2 Authorization. Purchaser has all necessary corporate power and authority to enter into this Agreement and the Ancillary Agreements and has taken all corporate or similar action necessary to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. This Agreement has been duly executed and delivered by Purchaser, and this Agreement is, and upon execution and delivery thereof each Ancillary Agreement to which Purchaser is a party will be, a valid and binding obligation of Purchaser, as the case may be, enforceable against Purchaser in accordance with its terms, except that enforceability may be limited by the effect of (a) bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights of creditors or (b) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

4.3 Brokers; Transactions Costs. Purchaser has neither entered into or will enter into any contract, agreement, arrangement or understanding with any Person which has or will result in the obligation of Seller to pay any finder's fee, brokerage commission, legal, accounting or similar payment in connection with the transactions contemplated hereby.

4.4 Transferred Assets "AS IS"; Purchaser's Acknowledgment Regarding Same. Purchaser agrees, warrants, and represents that, except as set forth in this Agreement, (a) Purchaser is purchasing the Transferred Assets on an "AS IS" basis based solely on Purchaser's own investigation of the Transferred Assets and (b) neither Seller nor any real estate broker, agent, officer, employee, servant, attorney, or representative of Seller has made any warranties, representations or guarantees, express, implied or

25

statutory, written or oral, respecting the Transferred Assets, or any part of the Transferred Assets, including the Leased Real Property, or any matters pertaining thereto, including respecting the compliance or non-compliance with or the applicability or non-applicability of, any other building, health, zoning, Environmental, Health and Safety Laws, or any other applicable city and county, state, or federal statute, ordinance, code, rule, regulation, or other law, relating to the Transferred Assets, or any part thereof, or relating to the financial performance or future prospects of the Transferred Assets or the Business, or otherwise with regard to or pertaining to the Transferred Assets, Purchaser's intended use and operation thereof, or the physical condition of the Transferred Assets. Purchaser further acknowledges that the consideration for the Transferred Assets specified in this Agreement has been agreed upon by Seller and Purchaser after good-faith arms'-length negotiation in light of Purchaser's agreement to purchase the Transferred Assets "AS IS," except as set forth in this Agreement. Purchaser agrees, warrants, and represents that, except as set forth in this Agreement, Purchaser has relied, and shall rely, solely upon its own investigation of all such matters, and that Purchaser assumes all risks with respect thereto. EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER MAKES NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, NOR ANY IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY MERCHANDISE, INVENTORY OR FURNITURE, FIXTURES AND EQUIPMENT.

     4.5     Availability of Funds.  Purchaser has the financial capability to consummate the Acquisition.  Purchaser's consummation of the Acquisition is not in any way contingent upon or otherwise subject to (a) Purchaser's consummation of any financing arrangements or Purchaser's obtaining of any financing, or (b) the availability, grant, provision or extension of any financing to Purchaser.

## ARTICLE 5
## COVENANTS

     5.1     Access and Availability.  During the Pre-Closing Period, Seller shall (a) afford Purchaser and its Representatives reasonable access to, during normal business hours, and if reasonably requested by Purchaser, evenings and week-ends, in a manner so as not to interfere with the normal business operations and upon reasonable prior written notice, the properties, Contracts, books and records and other documents and data pertaining to Seller, the Business, the Assumed Liabilities and the operation of the Transferred Assets, and (b) furnish Purchaser and its Representatives with such additional financial, operating and other data and information as they may reasonably request.

     5.2     Operation of the Business.

          (a)     Except with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), as otherwise contemplated or permitted by this Agreement or as required by the Bankruptcy Code, during the Pre-Closing Period, Seller shall operate the Business in the ordinary course (taking into account Seller's status as a debtor-in-possession), comply with all Legal Requirements applicable to the operation of its business and preserve its present business organization intact. During the Pre-Closing Period, Seller shall use commercially reasonable efforts to:

          (i)     maintain in full force and effect the Permits in all material respects;

          (ii)     maintain all of the Transferred Assets in a manner consistent with past practices, reasonable wear and tear excepted and maintain the types and levels of insurance currently in effect in respect of the Transferred Assets;

(iii) upon any damage, destruction or loss to any Transferred Asset, apply any insurance proceeds received with respect thereto to the prompt repair, replacement and restoration thereof to the condition of such Transferred Asset before such event or, if required, to such other (better) condition as may be required by applicable Legal Requirements;

(iv) replenish the Inventory such that the mix, character and quality of the Inventory on the Closing Date is substantially similar as on the date hereof;

(v) pay when due all undisputed amounts owed under the Facilities Leases; and

(vi) consult with Purchaser on all material aspects of the Business as may be reasonably requested from time to time by Purchaser, including, but not limited to, personnel, accounting and financial functions.

(b) Except as otherwise contemplated or permitted by this Agreement, during the Pre-Closing Period, Seller shall not, without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned):

(i) terminate or amend any of the Facilities Leases (or execute any amendments or modifications to any Facilities Leases), or cancel, modify or waive any claims held in respect of the Transferred Assets or waive any material rights of value;

(ii) do any act or fail to do any act that will cause a material breach or default in any of the Facilities Leases;

(iii) sell, transfer or otherwise dispose of any of the Transferred Assets except in the ordinary course of business, consistent with past practices;

(iv) modify any of its sales practices or receivables collections practices from those in place on the date hereof, including offering any discounts, incentives or other accommodations for early payment;

(v) conduct any "going out of business," liquidation, bankruptcy, or similar sales or take any action to fashion its business as going out of business, liquidating or closing;

(vi) grant to any Employee any increase in compensation, except increases to non-management Employees in the ordinary course of business;

(vii) terminate any Employee related to the Business, except non-management Employees in the ordinary course of business;

(viii) make or rescind any material Tax election or take any material Tax position (unless required by law) or file any Tax Return or change its fiscal year or financial or Tax accounting methods, policies or practice, or settle any Tax Liability, except in each case as would not reasonably be expected to materially affect Purchaser;

(ix) modify, rescind or terminate a material Permit, allowance, or credit (or application therefor) relating to the Business or the Transferred Assets;

27

    (x) dispose of or fail to keep in effect any material rights in, to, or for the use of any of the Intellectual Property, except for rights which expire or terminate in accordance with their terms;

    (xi) issue any shares of stock or stock equivalents;

    (xii) subject its assets to any material Encumbrances;

    (xiii) directly or indirectly make any dividend or other distribution to shareholders or repurchase or reacquire any equity interests;

    (xiv) close the Store / Headquarters;

    (xv) issue any purchase order for non-branded goods in excess of $100,000;

    (xvi) incur any Indebtedness other than under current credit arrangements provided to Purchaser; or

    (xvii) authorize any of the foregoing, or commit or agree to take actions, whether in writing or otherwise, to do any of the foregoing.

  5.3 <u>Notices and Consents</u>. As promptly as practicable following the execution hereof, each of the Parties will deliver any notices to, make any filings with and use its commercially reasonable efforts to obtain any authorizations, consents and approvals of Governmental Bodies required in connection with the consummation of the transactions contemplated by this Agreement. During the Pre-Closing Period, Seller and Purchaser shall reasonably cooperate with one another: (a) in obtaining all consents identified in Section 3.22 of the Disclosure Schedule, (b) with respect to all filings that Purchaser is required by any Legal Requirement to make in connection with the transactions contemplated hereby, and (c) in delivering any notices deemed necessary or desirable by Purchaser or Seller in connection with the Bankruptcy Case. Seller shall promptly deliver to Purchaser copies of all filings, correspondence and orders to and from any Governmental Body in connection with the transactions contemplated hereby.

  5.4 <u>Commercially Reasonable Efforts</u>. Subject to the terms and conditions of this Agreement:

    (a) During the Pre-Closing Period, each of Seller and Purchaser shall (i) use its commercially reasonable efforts (A) to cause the conditions in Article 7 and Article 8, respectively, to be satisfied, (B) to deliver or cause to be delivered at the Closing the items to be delivered by Seller and Purchaser pursuant to Section 2.3(b), (C) obtain the right to assume and assign, or otherwise obtain consent of the applicable licensors with respect to, the Key Software Licenses so as to assure the continued availability of such licensed software to Purchaser from and after the Closing, and (D) to take all other actions to consummate the transactions contemplated hereby, and (ii) not take any action that will have the effect of unreasonably delaying, impairing or impeding the receipt of any authorizations, consents, orders or approvals to be sought pursuant to this Agreement.

    (b) From and after the Closing, Seller and Purchaser shall use commercially reasonable efforts to deliver or cause to be delivered such additional documents and other papers and to take or cause to be taken such further actions as may be necessary, proper or advisable to make effective the transactions contemplated hereby and to carry out the provisions hereof.

SV\541902.5

5.5     Notice of Developments. Seller shall promptly notify Purchaser in writing of any change or development that would cause any of the representations and warranties herein not to be true and correct in any material respect or any other material development in the Business, the Transferred Assets, or the Assumed Liabilities.

5.6     Bankruptcy Proceedings.

(a)     Purchaser and Seller acknowledge that this Agreement, the sale of the Transferred Assets, and the assumption and assignment of the Facilities Leases of Seller are subject to Bankruptcy Court approval.

(b)     Seller has filed with the Bankruptcy Court a Petition for reorganization relief pursuant to Chapter 11 of the Bankruptcy Code and the Sale Motion, together with appropriate supporting papers and notices, seeking the entry, by no later than January 31, 2007, of the Sale Order.

(c)     Seller shall use its commercially reasonable efforts to obtain entry of the Sale Order no later than January 31, 2007.

(d)     In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

(e)     Seller shall not take any action that is intended, or fail to take any action the intent of which failure to act would result in the reversal, voiding, modification or staying of the Sale Order.

(f)     During the Pre-Closing Period, Seller shall use its reasonable efforts to provide such prior notice as may be reasonable under the circumstances before filing any papers in the Bankruptcy Case that relate, in whole or in part, to this Agreement or Purchaser.

5.7     Expense Reimbursement Amount. If this Agreement is terminated for any reason other than by Seller pursuant to Section 9.1(d) or (e) Seller shall pay Purchaser the Expense Reimbursement Amount upon termination of this Agreement. The Expense Reimbursement Amount shall be payable as allowed administrative expenses under Sections 503(b) and 507(a) of the Bankruptcy Code. Purchaser's receipt of the Expense Reimbursement Amount in accordance with the terms of this Section 5.7 shall be in full settlement and satisfaction of any damages of any kind that Purchaser may suffer as a result of the termination of this Agreement or a breach by Seller of its obligations hereunder prior to Closing and shall be Purchaser's sole and exclusive remedy in damages for Seller's breach of its obligations hereunder prior to Closing.

5.8     Notice of Bids. If Seller shall receive any offer, proposal or inquiry regarding the acquisition of all or any portion of the Transferred Assets, Seller shall within two (2) Business Days thereafter: (a) notify Purchaser, in writing, of such proposal or offer, or any inquiry or contact with any Person with respect thereto, and shall, in any such notice to Purchaser indicate in reasonable detail the identity of the offeror and the terms and conditions of any proposal and (b) after entry of the Sale Order, notify any such offeror of the entry of the Sale Order and the fact that Seller is neither considering nor permitted to consider any such proposal or offer.

5.9     Reserved.

SV\541902.5

5.10    Employee Matters.

(a)    Prior to the Closing, Purchaser shall offer to enter into a severance agreement with David G. Yoder to become effective upon the commencement of his employment with Purchaser, which agreement shall be on the same terms and conditions as offered by Purchaser to its executive officers of a similar level.

(b)    Section 5.10 of the Disclosure Schedule, which Purchaser shall deliver not later than the Business Day prior to the Closing Date, shall set forth the list of the employees of Seller that are expected to become employees of Purchaser or one of its Affiliates (the "Designated Employees"). Seller shall terminate the employment of all Designated Employees to whom Purchaser or one of its Affiliates offers employment immediately prior to the Closing, and Seller shall cooperate with and use commercially reasonable efforts to assist Purchaser and its Affiliates in their respective efforts to secure satisfactory employment arrangements with the Designated Employees, including providing Purchaser with access to the Designated Employees for purposes of negotiating terms of employment. Nothing contained in this Agreement shall confer upon any Designated Employee any right with respect to employment, or continuance thereof, with Purchaser or one of its Affiliates, nor shall anything herein interfere with the right of Purchaser and its Affiliates to terminate the employment of any of the Designated Employees at any time, with our without cause and with or without prior notice, or restrict Purchaser or its Affiliates in the exercise of their independent business judgment in modifying any of the terms and conditions of the employment of the Designated Employees. Purchaser shall have no obligation with respect to claims by any employee of Seller, including any Designated Employee, whether under any Employee Plan or for severance, unpaid wages, unpaid accrued time off, unpaid bonuses, credit for prior service, unpaid commissions or otherwise, except, from and after the Closing, with respect to (i) the Assumed Liabilities specified in Section 2.2(c)(iii) and (ii) obligations under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended. Seller shall be responsible for any and all Liability under the WARN Act or other Legal Requirements that arises out of or results from any termination of employment by Seller. Seller confirms that it has provided to each of its employees on or about November 22, 2006 and January 15, 2007 all notices required to be provided in order to comply with the WARN Act, including a valid and complete WARN Act notice.

5.11    Confidentiality. Subject to the requirements of the Bankruptcy Code or as may be imposed by the Bankruptcy Court, from and after the Closing: (a) Seller shall, and shall cause its Affiliates to, hold in confidence all confidential information (including trade secrets, customer lists, marketing plans and pricing information) of Seller; (b) in the event that Seller or any of its Affiliates shall be legally compelled to disclose any such information, Seller shall provide Purchaser with prompt written notice of such requirement so that Purchaser may seek a protective order or other remedy; and (c) in the event that such protective order or other remedy is not obtained, Seller or its Affiliate shall furnish only such information as is legally required to be provided. Notwithstanding the forgoing, nothing in this Section 5.11 shall restrict Seller's provision of confidential information to other potential bidders pursuant to a confidentiality agreement substantially in the form executed by Purchaser, whether or not such Person is ultimately determined to be a Qualified Bidder.

5.12    Change of Name. After the Closing Date, neither Seller nor any of its Affiliates shall use the names or marks listed in Section 3.17(a) of the Disclosure Schedule or any derivatives thereof for commercial purposes. The Sale Order shall provide for the modification of the caption in the proceedings before the Bankruptcy Court to reflect the change in the names of Seller, except that during the pendency of such proceedings, Seller shall be permitted to use the name "Woodwind & Brasswind" as its corporate alias in connection with matters relating such case, but for no other commercial purpose. After the Closing, Seller and its Affiliates shall promptly file with the applicable Governmental Bodies all documents necessary to delete from their names each of the tradenames, marks or any derivatives thereof

30

SV\541902.5

and shall do or cause to be done all other acts, including the payment of any fees required in connection therewith, to cause such documents to become effective as promptly as practicable.

5.13 **Transfer of Assets.** Prior to the Closing, Seller shall cause all assets used by Seller in the conduct of the Business that are owned by an Affiliate of Seller to be transferred to Seller.

5.14 **Cure Costs.** On or before Closing, Seller shall pay all Cure Costs. All Cure Costs will be agreed upon by Seller and each party entitled to receipt of a cure payment, or will be determined by the Bankruptcy Court.

## ARTICLE 6
## CONDITIONS PRECEDENT TO THE PARTIES' RESPECTIVE OBLIGATION TO CLOSE

The respective obligations of Purchaser and Seller to consummate the Acquisition shall be subject to the satisfaction at or prior to the Closing of the following conditions, any or all of which may be waived only by agreement of Purchaser and Seller, in whole or in part, to the extent permitted by applicable Legal Requirements:

6.1 **No Restraints.** No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the Acquisition shall have been issued by any court of competent jurisdiction and remain in effect, and there shall not be any Legal Requirement enacted or deemed applicable to the consummation of the transactions contemplated by this Agreement that makes consummation of the Acquisition illegal.

6.2 **Governmental Authorizations.** All requisite Governmental Authorizations or waiting periods following governmental filings shall have been obtained or expired.

## ARTICLE 7
## CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE

The obligation of Purchaser to consummate the Acquisition shall be subject to the satisfaction at or prior to the Closing of the following conditions, any or all of which may be waived only by Purchaser, in whole or in part, to the extent permitted by applicable Legal Requirements:

7.1 **Accuracy of Representations.** (a) Each of the representations and warranties of Seller in this Agreement that is qualified as to materiality shall be true and correct in each case as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (unless made as of a specific date, in which event such date shall be applicable), and (b) each of the representations and warranties of Seller in this Agreement that is not qualified as to materiality shall be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (unless made as of a specific date, in which event such date shall be applicable), in case of each of clause (a) and clause (b), without giving effect to any update to the Disclosure Schedule.

7.2 **Performance of Obligations.** Seller shall have complied in all material respects with each of the covenants contained in this Agreement to be performed by Seller prior to the Closing.

7.3 **Deliveries.** Seller shall have executed and delivered or caused to be executed and delivered to Purchaser the agreements and documents identified in Section 2.3(b) to be delivered to Purchaser by or on behalf of Seller or the Affiliate of Seller identified therein, and each such agreement and document shall be in full force and effect.

31

7.4     No Material Adverse Effect. Since the date of this Agreement there shall have been no event, condition, change, development or other matter, or any worsening of any existing event, condition, change, development or other matter that, individually or in combination with any other event, condition, change, development or other matter or worsening thereof, has had or could reasonably be expected to have a Material Adverse Effect.

7.5     Orders. The Bankruptcy Court shall have entered the Sale Order, and such order shall have become a Final Order.

7.6     Executory Contracts. The Bankruptcy Court shall have approved and authorized the assumption and assignment of the Contracts to be identified on the Assignment Agreement.

7.7     Key Software Licenses. Purchaser shall have obtained the right to assume and assign, or otherwise obtained consent of the applicable licensors with respect to, the Key Software Licenses so as to assure the continued availability of such licensed software to Purchaser from and after the Closing on terms and conditions reasonably acceptable to Purchaser.

7.8     No Proceedings. Since the date of this Agreement, there shall not have been commenced against Purchaser, or against any Person affiliated with Purchaser, any Proceeding (a) involving any material challenge to, or seeking material damages or other material relief in connection with, the Acquisition, or (b) that may have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with the Acquisition.

7.9     Governmental Approvals. All consents, approvals and authorizations of any Governmental Entity required in connection with the transactions contemplated by this Agreement shall have been obtained, in each case, without (a) the imposition of conditions, (b) the requirement of divesting Purchaser of any assets or property or (c) the requirement of expenditure of money by Purchaser to a third party in exchange for any such consent.

## ARTICLE 8
## CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE

The obligation of Seller to consummate the Acquisition shall be subject to the satisfaction at or prior to the Closing of the following conditions, any or all of which may be waived only by Seller, in whole or in part, to the extent permitted by applicable Legal Requirements:

8.1     Accuracy of Representations. (a) Each of the representations and warranties of Purchaser in this Agreement that is qualified as to materiality shall be true and correct in each case as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (unless made as of a specific date, in which event such date shall be applicable), and (b) each of the representations and warranties of Purchaser in this Agreement that is not qualified as to materiality shall be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (unless made as of a specific date, in which event such date shall be applicable).

8.2     Performance of Obligations. Purchaser shall have complied in all material respects with each of the covenants contained in this Agreement to be performed by Purchaser prior to the Closing.

8.3     Deliveries. Purchaser shall have executed and delivered or caused to be executed and delivered to Seller the agreements and documents identified in Section 2.3(b) to be delivered to Seller by or on behalf of Purchaser, and each such agreement and document shall be in full force and effect.

8.4     No Proceedings. Since the date of this Agreement, there shall not have been commenced against Seller, or against any Person affiliated with Seller, any Proceeding (a) involving any material challenge to, or seeking material damages or other material relief in connection with, the Acquisition, or (b) that may have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with the Acquisition.

## ARTICLE 9
## TERMINATION

9.1     Termination Events. This Agreement may be terminated prior to the Closing by:

(a)     mutual written consent of Purchaser and Seller;

(b)     (i) Purchaser if the Closing has not taken place on or before February 15, 2007 or (ii) Seller if the Closing has not taken place on or before March 15, 2007 (in each case other than as a result of any failure on the part of the terminating party to comply with or perform any of their respective covenants or obligations set forth in this Agreement);

(c)     Purchaser (i) if there is a material breach of any representation or warranty or any covenant or agreement to be complied with or performed by Seller pursuant to the terms of this Agreement or (ii) upon the failure of a condition to the obligations of Purchaser set forth in Article 7 to be satisfied (and such condition is not waived in writing by Purchaser) on or prior to the Closing Date, or the occurrence of any event that results or would result in the failure of a condition to the obligations of Purchaser set forth in Article 7 to be satisfied on or prior to the Closing Date; provided, however, that such breach or failure is through no fault of Purchaser; provided, further, however, that if such inaccuracy in Seller's representations and warranties or a breach of a covenant by Seller is curable by Seller, then Purchaser may not terminate this Agreement under this Section 9.1(c) on account of such inaccuracy or breach until the earlier of (A) the expiration of a ten (10) Business Day period commencing upon delivery of written notice from Purchaser to Seller of such breach or inaccuracy and (B) Seller ceasing to exercise commercially reasonable efforts to cure such breach (it being understood that this Agreement shall not terminate pursuant to this Section 9.1(c) as a result of such particular breach or inaccuracy if such breach by Seller is cured prior to such termination becoming effective);

(d)     Seller (i) if there is a material breach of any representation or warranty or any covenant or agreement to be complied with or performed by Purchaser pursuant to the terms of this Agreement or (ii) upon the failure of a condition to the obligations of Seller set forth in Article 8 to be satisfied (and such condition is not waived in writing by Seller) on or prior to the Closing Date, or the occurrence of any event that results or would result in the failure of a condition to the obligations of Seller set forth in Article 8 to be satisfied on or prior to the Closing Date; provided, however, that such breach or failure is through no fault of Seller; provided, further, however, that if such inaccuracy in Purchaser's representations and warranties or a breach of a covenant by Purchaser is curable by Purchaser, then Seller may not terminate this Agreement under this Section 9.1(d) on account of such inaccuracy or breach until the earlier of (A) the expiration of a ten (10) Business Day period commencing upon delivery of written notice from Seller to Purchaser of such breach or inaccuracy and (B) Purchaser ceasing to exercise commercially reasonable efforts to cure such breach (it being understood that this Agreement shall not terminate pursuant to this Section 9.1(d) as a result of such particular breach or inaccuracy if such breach by Purchaser is cured prior to such termination becoming effective);

(e)     Purchaser or Seller if a court of competent jurisdiction or other Governmental Body (other than the Bankruptcy Court) shall have issued a final and nonappealable order, decree or

33

ruling, or shall have taken any other action, having the effect of permanently restraining, enjoining or otherwise prohibiting the Acquisition; or

    (f)    Purchaser or Seller if the Bankruptcy Court shall not have entered the Sale Order on or before February 2, 2007, provided that such terminating party is not in material breach of this Agreement.

    9.2    Termination Procedures. Subject to Section 9.3, if Purchaser wishes to terminate this Agreement pursuant to Section 9.1(a), Section 9.1(b)(i), Section 9.1(c), Section 9.1(e) or Section 9.1(f), then Purchaser shall deliver to Seller a written notice stating that Purchaser is terminating this Agreement in accordance with the respective section. Subject to Section 9.3, if Seller wishes to terminate this Agreement pursuant to Section 9.1(a), Section 9.1(b)(ii), Section 9.1(d), Section 9.1(e) or Section 9.1(f), then Seller shall deliver to Purchaser a written notice stating that Seller is terminating this Agreement in accordance with the respective section.

    9.3    Expenses; Termination Fees. Except as set forth in Section 5.7 (which obligations it is expressly agreed survive termination of this Agreement), all fees and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the party incurring such expenses, whether or not the Acquisition is consummated.

    9.4    Effect of Termination. If this Agreement is terminated pursuant to Section 9.1, all further obligations of the parties under this Agreement shall terminate; provided, however, that the Parties shall, in all events, remain bound by and continue to be subject to the provisions set forth in Section 2.2(a), Section 5.7, Section 5.11, Section 9.3, Section 9.4, Section 11.1, Section 11.2, Section 11.5, Section 11.6 and Section 11.11.

## ARTICLE 10
## ADDITIONAL COVENANTS

The Parties further agree as follows:

    10.1    General. In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request. Seller shall use its commercially reasonable efforts from and after the Closing to cause any and all Encumbrances on the Transferred Assets that exist on the Closing Date to be released without cost to Purchaser.

    10.2    Leases and Other Agreements.

    (a)    Purchaser shall assume all of Seller's right, title and interest in and to, and shall pay and perform all liabilities and obligations as and when due under, the Facilities Leases; provided, however, that such assumption shall be conditioned on Purchaser's successful renegotiation of the Facilities Leases to (i) amend the terms of the Store / Headquarters lease in accordance with the material terms of lease amendment attached as Exhibit G-1, which shall become effective as of the Closing Date and (ii) amend the Distribution Center lease in accordance with the material terms of lease amendment attached as Exhibit G-2, which shall become effective as of the Closing Date; provided, further, that the terms in such Facilities Leases regarding rent and real property taxes payable by the tenant shall remain in their current form for the duration of the amended terms of the respective Facilities Leases. The assumption agreement relating to such Facilities Leases shall include representations and warranties that Seller has good and valid leasehold title to the Leased Real Property, that each Facility has received all

required approvals of Governmental Bodies, and regarding the suitability of the Leased Real Property and customary estoppel provisions. The parties acknowledge that such terms have been agreed to pursuant to a letter agreement between Purchaser and Bamber, LLC, dated as of the date of this Agreement.

    (b) Purchaser and Seller and the Affiliates of Seller who control Barrington, Inc. shall arrive at an agreement with the material terms set forth in Exhibit I designed to provide Purchaser with continued access to such products consistent with past practice (the "Barrington/LA Sax Agreement").

    (c) At or prior to Closing, Seller shall pay and perform all liabilities and obligations as and when due under the LaSalle Equipment Lease, including payment of the purchase option, so as to cause the Seller to be the owner of all property subject to such lease and such assets to become Transferred Assets hereunder. Seller estimates the payoff amount as of January 31, 2007 to be $2,718,343.

  10.3 Certain Tax Matters. The Parties agree that inasmuch as the Transferred Assets include substantially all the operating assets of Seller, the sale and purchase of the Transferred Assets may be exempt from sales and use Taxes in the jurisdictions in which the Transferred Assets are located pursuant to the bulk sale, occasional sale, or sale for resale provisions in the applicable Legal Requirements, and the Parties hereto shall treat the transfer of the Transferred Assets provided for herein as a bulk, occasional sale, or sale for resale for all purposes; provided, however, that to the extent it shall be determined after the date of the Agreement that the sale by Seller, and the purchase by Purchaser, of all or any portion of the Transferred Assets is subject to a sale, use or other transfer Tax, then such Tax (and any penalties and interest) shall be paid by Seller. The Parties shall cooperate with each other in the preparation, execution and filing of exemption certificates or any Tax Returns that may be required in connection with such Taxes and any related filing fees, notarial fees and other costs.

  10.4 Access to Books, Records, Etc.; Further Action.

    (a) Each Party agrees that, after the Closing, it will cooperate with and make available to the other Parties, during normal business hours and upon reasonable notice, all books and records, and other information retained and remaining in existence after the Closing Date with respect to the Transferred Assets or the Assumed Liabilities that are necessary or useful in connection with any use of the Transferred Assets or the operation of the Business by Purchaser after the Closing. Seller agrees that it shall preserve and keep all such books and records of Seller retained by it for a period of at least three (3) years from the Closing Date. After such three (3) year period, Seller may dispose of such books and records, unless notified by Purchaser at least sixty (60) days prior to the expiration of such three (3) year period that Purchaser wishes to retain such books and records, in which case Purchaser shall be permitted, at its sole cost and expense, to remove all or any part of such books and records. Additionally, Seller shall have access to the books and records acquired by Purchaser for the period commencing on the Closing Date and ending three (3) years from the Closing Date for any proper purpose relating to the operation of its business prior to the Closing Date. Following the Closing, Seller shall promptly provide Purchaser with any notices or other documents received by Seller relating to the Business.

    (b) From and after the Closing Date, Seller shall cooperate with Purchaser and its Affiliates and Representatives, and shall execute and deliver such documents and take such other actions as Purchaser may reasonably request, for the purpose of evidencing the Acquisition and putting Purchaser in possession and control of all of the Transferred Assets. Without limiting the generality of the foregoing, from and after the Closing Date, Seller shall promptly remit to Purchaser any funds that are received by Seller and that are included in, or that represent payment of receivables included in, the Transferred Assets. Purchaser shall promptly remit to Seller any funds that are received by Purchaser and

that are included in the Excluded Assets. Seller: (i) hereby irrevocably authorizes Purchaser, at all times on and after the Closing Date, to endorse in the name of Seller any check or other instrument that is made payable to Seller and that represents funds included in, or that represents the payment of any receivable included in, the Transferred Assets; and (ii) hereby irrevocably nominates, constitutes and appoints Purchaser as the true and lawful attorney-in-fact of Seller (with full power of substitution) effective as of the Closing Date, and hereby authorizes Purchaser, in the name of and on behalf of Seller, to execute, deliver, acknowledge, certify, file and record any document, to institute and prosecute any Legal Proceeding and to take any other action (on or at any time after the Closing Date) that Purchaser may deem appropriate for the purpose of (A) collecting, asserting, enforcing or perfecting any claim, right or interest of any kind that is included in or relates to any of the Transferred Assets (including, without limitation, the delivery of documents of conveyance to the United States Patent and Trademark Office, foreign trademark registries and domestic and foreign URL registries) , (B) defending or compromising any claim or Legal Proceeding relating to any of the Transferred Assets, or (C) otherwise carrying out or facilitating the Acquisition. The power of attorney referred to in the preceding sentence is and shall be coupled with an interest and shall be irrevocable, and shall survive the dissolution or insolvency of Seller. Purchaser shall give prompt notice in reasonable detail to Seller of any action taken by Purchaser under the foregoing clause (ii) of this Section 10.4, including copies of any documents executed by Purchaser under such clause (ii).

## ARTICLE 11
## GENERAL PROVISIONS

11.1   Applicable Law. The execution, performance and interpretation of this Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Indiana.

11.2   Jurisdiction; WAIVER OF JURY TRIAL. The parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or the breach hereof. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.3   Termination of Representations and Warranties. The representations and warranties of the Parties set forth in Articles III and IV of this Agreement shall terminate and be of no further force or effect after the Closing Date.

11.4   Notices. All notices required or permitted to be given under this Agreement shall be in writing, and will be deemed given on the date of receipt if delivered in person, or on the date of mailing if mailed by overnight courier or registered or certified mail, postage prepaid, return receipt requested, to the applicable Party at its address indicated on the signatures pages to this Agreement. Any Party may change its address for purposes of this Agreement by giving fifteen (15) days' prior written notice of such change of address to the other Party in the manner described in this Section 11.4.

11.5   Confidentiality. The following is subject to any disclosure requirements under the Bankruptcy Code or imposed by the Bankruptcy Court: Purchaser and Seller each agree that it will treat in confidence all documents, materials and other information that it shall have obtained regarding the other party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, at the request of the disclosing party, will return to the other party all copies of nonpublic documents and materials which have been furnished

36

in connection therewith. Such non-public documents, materials and information shall not be communicated to any third Person (other than to Purchaser's and Seller's respective counsel, accountants or financial advisors, in each case subject to the recipient's agreement to keep the same confidential). No other party shall use any confidential information in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Transferred Assets; provided, however, that after the Closing, Purchaser may use or disclose any confidential information included in the Transferred Assets or otherwise reasonably related to the Transferred Assets and the business. The obligation of each party to treat such documents, materials and other information in confidence shall not apply to any information which (a) is or becomes available to such party from a source other than the disclosing party, (b) is or becomes available to the public other than as a result of disclosure by such party or its agents or (c) is required to be disclosed under applicable law, judicial process or rule of any national securities exchange or quotation service.

11.6   Public Announcements. All public announcements or statements with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other Party shall be jointly approved by Seller and Purchaser; provided, however, that if the Parties are unable to agree on a public statement or announcement and Seller or Purchaser determines, after consultation with counsel, that such statement or announcement is required by applicable Legal Requirement or by obligations of the Parties or their Affiliates pursuant to any listing agreement with or rules of any national securities exchange or quotation service, then Seller or Purchaser, as the case may be, may issue such statement or announcement.

11.7   Binding Effect; Assignment. No Party shall assign any of its rights, or delegate any of its obligations under this Agreement to any third party without the prior written consent of the other Parties; provided, however, that Purchaser may assign this Agreement to one or more Affiliates of Purchaser without the consent of any Party so long as Purchaser remains fully and primarily liable under this Agreement. This Agreement is binding upon, and shall inure solely to the benefit of, the parties hereto and their respective heirs, personal representatives, successors and permitted assigns. This Agreement is not intended to benefit, and shall not be construed as benefiting, any third party, and no third party shall have standing to enforce any provision of this Agreement. Without limiting the generality of the foregoing, no Transferred Employee shall have any claim against Purchaser pursuant to this Agreement except pursuant to a separate written offer of employment delivered directly by Purchaser to such individual Transferred Employee.

11.8   Modification. No purported modification, amendment or waiver of any term of this Agreement shall be effective unless it is in writing, subsequent to this Agreement and signed by all parties hereto.

11.9   Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same agreement. Facsimile copies shall also be deemed originals.

11.10   Severability. Purchaser and Seller agree that the provisions of this Agreement are severable and separate and that the unenforceability of any specific provision or part of any provision shall not affect the validity of any other provision or term of this Agreement.

11.11   Entire Agreement. This Agreement, together with the Ancillary Agreements and the instruments delivered hereunder and thereunder, constitutes the entire agreement of Purchaser and Seller with respect to the subject matter hereof and supersedes any and all prior and contemporaneous understandings or agreements, whether oral or written, concerning such subject matter, including that certain letter agreement between Purchaser and Seller dated November 3, 2006. Each Party

37

acknowledges that it enters into this Agreement without relying on any statement by the other Party which is not specifically set forth in this Agreement.

    11.12    Interpretation of Agreement.

    (a)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, schedule and exhibit references are to this Agreement unless otherwise specified. The meaning of defined terms shall be equally applicable to the singular and plural forms of the defined terms. The terms "include" and "including" are not limiting and mean "including without limitation." The masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.

    (b)    References to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto.

    (c)    References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

    (d)    The captions and headings of this Agreement are for convenience of reference only and shall not affect the construction of this Agreement.

    (e)    The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

    (f)    The annexes, schedules and exhibits to this Agreement are a material part hereof and shall be treated as if fully incorporated into the body of the Agreement. For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa.

*(Signature Page Follows)*

38

SV\541902.5

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement effective as of the date first written above.

        PURCHASER:

        MUSICIAN'S FRIEND, INC.

        By: _____
            Leland P. Smith
            Executive Vice President

        Address for Notice:

            c/o Guitar Center, Inc.
            5795 Lindero Canyon Road
            Westlake Village, California 91362
            Attention: General Counsel
            Fax: (818) 735-4923

        with a copy (which shall not constitute notice) to:

            Latham & Watkins LLP
            140 Scott Drive
            Menlo Park, California 94025
            Attention: Anthony J. Richmond, Esq.
            Fax: (650) 463-2600

        SELLER:

        DENNIS BAMBER, INC., D/B/A THE WOODWIND & THE BRASSWIND

        By: _____
            Dennis Bamber
            President

        Address for Notice:

            4004 Technology Drive
            South Bend, IN 46628
            Fax: (574) 251-3549

        with a copy (which shall not constitute notice) to:

            c/o _____
            Attention: _____
            Fax: (___) _____

S-1

SV\541902.5

# EXHIBITS A - D

# TO ASSET PURCHASE AGREEMENT

RESERVED

# EXHIBIT E

# TO ASSET PURCHASE AGREEMENT

(Form of Assignment Agreement)

**Exhibit E**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of [_____], 2007, by and between Dennis Bamber, Inc., d/b/a The Woodwind & The Brasswind, an Indiana corporation ("Seller"), in favor of [*Guitar Center entity*], a Delaware corporation ("Purchaser").

WHEREAS, Seller and Purchaser are parties to that certain Asset Purchase Agreement, dated as of November 30, 2007 (the "Purchase Agreement"), pursuant to which Seller is selling to Purchaser, and Purchaser is acquiring from Seller, substantially all of the assets of Sellers; and

WHEREAS, Purchaser and Seller now seek to effect the assignment by Seller to Purchaser of the Assumed Liabilities (as defined in the Purchase Agreement).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and as contemplated by Section 2.3(b)(ii) of the Purchase Agreement, the parties, intending to be legally bound, do hereby agree as follows:

1. Capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Purchase Agreement.

2. Seller hereby assigns, sells, transfers and sets over (collectively, the "Assignment") to Purchaser all of Seller's right, title and interest in and to, and all of Seller's burdens, obligations and liabilities in connection with, each of the Assumed Liabilities. Purchaser hereby accepts the Assignment, and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants of, and to pay and discharge, all of the liabilities of Seller to be observed, performed, paid or discharged from and after the Closing, in connection with the Assumed Liabilities. Purchaser does not assume any Excluded Liabilities, and the parties hereto agree that all such Excluded Liabilities shall remain the sole responsibility of Seller.

3. This Agreement is subject in all respects to the terms and conditions of the Purchase Agreement.

4. This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Indiana (without giving effect to principles of conflicts of laws).

5. This Agreement may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.

*[Remainder of this page intentionally left blank]*

**Exhibit E**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above.

                        **DENNIS BAMBER, INC. (D/B/A THE WOODWIND & THE BRASSWIND)**

                        By:_____
                        Name:
                        Title:

                        *[GUITAR CENTER ENTITY]*, **INC.**

                        By: _____
                        Name:
                        Title:

SV\531245.3