# EXHIBIT F

# TO ASSET PURCHASE AGREEMENT

(Form of Bill of Sale)

## BILL OF SALE

THIS BILL OF SALE (this "Bill of Sale") is made, executed and delivered as of this [__] day of [_____], 2007, by and between Dennis Bamber, Inc., d/b/a The Woodwind & The Brasswind, an Indiana corporation ("Seller"), and Musician's Friend, Inc., a Delaware corporation ("Purchaser").[1]

WHEREAS, Seller and Purchaser are parties to that certain Asset Purchase Agreement, dated as of January 30, 2007 (the "Purchase Agreement"), pursuant to which Seller is selling to Purchaser, and Purchaser is acquiring from Seller, substantially all of the assets of Seller; and

WHEREAS, Purchaser and Seller now seek to consummate the sale, assignment, transfer, conveyance and delivery of the Transferred Assets (as defined in the Purchase Agreement).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and as contemplated by Section 2.3(b)(ii)(2) of the Purchase Agreement, the parties, intending to be legally bound, do hereby agree as follows:

1.       Capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Purchase Agreement.

2.       Seller hereby sells, assigns, transfers, conveys and delivers to Purchaser all of Seller's right, title and interest in and to the Transferred Assets, free of any Encumbrances, to have and to hold forever.[2]

3.       This Bill of Sale is subject in all respects to the terms and conditions of the Agreement.

4.       This Bill of Sale shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Indiana (without giving effect to principles of conflicts of laws).

5.       This Bill of Sale may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.

*[Remainder of this page intentionally left blank]*

---

[1] There may be multiple Bills of Sale if Guitar Center elects to book the acquisition in more than one affiliate.

[2] If multiple Bills of Sale, specify assets to be identified.

SV\531248.2

Exhibit F

IN WITNESS WHEREOF, the parties have caused this Bill of Sale to be executed as of the date first written above.

**DENNIS BAMBER, INC. (D/B/A THE WOODWIND & THE BRASSWIND)**

By:_____
Name:
Title:


**[*GUITAR CENTER ENTITY*]**

By: _____
Name:
Title:

# EXHIBIT G

# TO ASSET PURCHASE AGREEMENT

(Material Terms of Amendments to Real Estate Leases)

## SUMMARY OF TERMS AND CONDITIONS
## FOR AMENDMENT TO COMMERCIAL LEASE

The following terms and conditions summarize Guitar Center's proposal for revisions to that certain Commercial Lease, dated July 1, 2005 (the "Lease"), with respect to 4004 Technology Drive, South Bend, Indiana ("Premises"), by and between Bamber, LLC ("Landlord"), and Dennis Bamber, Inc. (d/b/a Woodwind & Brasswind) ("Existing Tenant"), to be assumed by Guitar Center, Inc., or its designees ("Guitar Center"). This letter and any contract or amendment executed in connection therewith shall become effective only following the closing of the acquisition of Existing Tenant by Guitar Center.

| | |
|---|---|
| TERM: | Twenty four (24) months from the effective date of the revised Lease (or amendment thereto). |
| OPTIONS: | One. One (1) year option to extend the Term. |
| MONTHLY RENT: | Monthly Rent for the initial term and option period shall be calculated in accordance with the terms of the Lease. |
| LANDLORD'S WARRANTIES: | Landlord warrants: (i) that the Premises comply with all laws, rules, and regulations, including, without limitation, the Americans with Disabilities Act and applicable hazardous materials laws, (ii) that all components and equipment of the Premises (including without limitation, the electrical, plumbing, HVAC system, fire sprinklers and the roof) are in good working order, as of the date of delivery of possession of Premises to Guitar Center, (iii) that the Premises are free from any material defects, and (iv) that Landlord has right and title to Premises and the land on which the Premises are constructed, and further has the legal right to lease the same to Guitar Center. |
| ASSIGNMENT AND SUBLETTING: | Landlord expressly permits Existing Tenant to assign the Lease to Guitar Center. Landlord's consent shall be required for any future assignment or sublease by Guitar Center, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that Landlord shall have no approval or consent rights with respect to an assignment or sublease by Guitar Center to an affiliate. Landlord shall not be entitled to any consideration in connection with any future assignment or sublease. Any assignee or sublessee of Guitar Center shall be permitted to exercise the extension options described above. In the event of an assignment or sublease to a non-affiliate, Guitar Center shall be released from all of its obligations and liability under the Lease. For purposes of this paragraph, "affiliate" refers to Guitar |

**Deleted:** Five (5) years

**Deleted:** Two

**Deleted:** Five (5)

**Deleted:** s

**Deleted:** INITIAL TERM¶

**Deleted:** OPTION TERM¶
MONTHLY RENT: . Effective on January 1st of each year of any option term, the Monthly Rent shall increase two and one-half percent (2.5%) over the Monthly Rent payable during the preceding year.¶
. ¶

Center Stores, Inc. or Musician's Friend, Inc.

**HAZARDOUS MATERIALS:**

Guitar Center shall not be responsible for (and Landlord shall indemnify Guitar Center in connection with) any hazardous materials (other than those created by Guitar Center after the date Guitar Center receives possession of the Premises) in or about the Premises.

**LANDLORD'S DEFAULT:**

Landlord shall be deemed in breach of the Lease if Landlord fails within a reasonable time to perform an obligation required to be performed by Landlord, including, without limitation, Landlord's maintenance and repair obligations set forth in Section 9 of the Lease. For purposes of this section, a reasonable time shall in no event be less than thirty (30) days after receipt by Landlord of written notice from Guitar Center specifying wherein such obligation of Landlord has not been performed; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days after such notice are reasonably required for its performance, then Landlord shall not be in breach of the Lease if performance is commenced within such thirty (30) day period and thereafter diligently pursued to completion. In the event of an emergency, any such repairs must be made as soon as practicable after receiving notice from Guitar Center.

**GUITAR CENTER'S REMEDIES:**

In addition to other remedies set forth in the Lease, in the event Landlord is in breach of the Lease beyond any applicable notice and cure periods, and/or fails to perform any terms, covenants, conditions or warranties under the Lease or under applicable law, Guitar Center shall receive one day of abatement of rent for each day such non-performance or non-compliance exists. If such period continues for more than ninety (90) days after written notice from Guitar Center, Guitar Center may at is sole option terminate the Lease by notice to Landlord while reserving all rights which Guitar Center may have for Landlord's default under the Lease. If any repairs required to be made by Landlord pursuant to Section 9 of the Lease are not made within the timeframes set forth above, Guitar Center, at its sole option, shall be permitted to make any such repairs, and offset from rent all costs associated with making such repairs.

**INDEMNIFICATION OF GUITAR CENTER:**

Except for Guitar Center's intentional acts or omissions, gross negligence and/or breach of the Lease, Landlord shall indemnify, protect, defend and hold harmless Guitar Center and its employees, agents, affiliates and representatives, from and against any and all

5795 Lindero Canyon Rd., Westlake Village, CA 91362          Phone: (818) 735-8800 Fax: (818)735-7923

claims, damages, costs, liens, judgments, penalties, permits, attorneys' and consultant's fees, expenses and/or liabilities arising out of, involving, dealing with or resulting from the Landlord's intentional acts or omissions, gross negligence and/or breach of the Lease, or those of its agents, contractors, employees or invitees occurring in or about or resulting from an occurrence in or about the Premises during the term of the Lease or while Guitar Center is in possession of the Premises, or out of default or breach by Landlord in the performance of any representation, warranty or obligation on Landlord's part to be performed under the Lease. The provisions of this Paragraph shall survive termination of the Lease with respect to events occurring prior to such termination.

**SNDA:**

To the extent that the Premises, or any portion thereof, are subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device, Landlord shall provide Guitar Center with a Subordination, Non-Disturbance Agreement which provides that if Landlord's interest in the Premises is sold or conveyed upon the exercise of any remedy provided in any security device or by deed in lieu thereof, or if the holder of the security device takes possession of the Premises thereto, that for so long as Guitar Center is not in default under the Lease beyond any applicable notice and cure period, Guitar Center's possession and the Lease will not be disturbed and Guitar Center shall be entitled the right of quiet enjoyment.

**LANDLORD'S INSURANCE:**

Landlord shall obtain and keep in force during the term of the Lease a policy or policies in the name of Landlord, with loss payable to Landlord and Guitar Center and to the holders of any mortgages, deeds of trust or ground leases on the Premises, insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full replacement cost of the Premises.

**ANCILLARY DOCUMENTS:**

Landlord shall, concurrent with final execution of this letter, submit to Guitar Center copies of all Reciprocal Easement Agreements (REAs); Covenants, Conditions and Restrictions (CCRs); Operation and Easement Agreement (OEAs); prohibited use agreements; Master or Ground Leases, if any; tax and utility bills and statements; and any other documents pertinent to the operation of the Premises, or which may in any way affect Guitar Center's intended use of the Premises.

5795 Lindero Canyon Rd., Westlake Village, CA 91362          Phone: (818) 735-8800 Fax: (818)735-7923

If the terms of this offer are acceptable to Landlord, please have an authorized representative of Landlord indicate so by signing where indicated below. If you have any questions or comments to the above, please do not hesitate to contact me.

Sincerely,

Leland P. Smith
Executive Vice President
Guitar Center, Inc.

AUTHORIZED SIGNATURE: _____

PRINTED NAME: _____

TITLE: _____

DATE: _____

Page 4 of 4

5795 Lindero Canyon Rd., Westlake Village, CA 91362          Phone: (818) 735-8800 Fax: (818)735-7923

# SUMMARY OF TERMS AND CONDITIONS FOR AMENDMENT TO COMMERCIAL LEASE

The following terms and conditions summarize Guitar Center's proposal for revisions to that certain Commercial Lease, dated May 1, 2005 (the "Lease"), with respect to 4955 Ameritech Drive, South Bend, Indiana ("Premises"), by and between Bamber, LLC ("Landlord"), and Dennis Bamber, Inc. (d/b/a Woodwind & Brasswind) ("Existing Tenant"), to be assumed by Guitar Center, Inc., or its designees ("Guitar Center"). This letter and any contract or amendment executed in connection therewith shall become effective only following the closing of the acquisition of Existing Tenant by Guitar Center.

TERM: Eighteen (18) months from the effective date of the revised Lease (or amendment thereto).

OPTION: One-One (1) year option to extend the Term.

MONTHLY RENT: Monthly Rent for the initial term and option period shall be calculated in accordance with the terms of the Lease.

LANDLORD'S WARRANTIES: Landlord warrants: (i) that the Premises comply with all laws, rules, and regulations, including, without limitation, the Americans with Disabilities Act and applicable hazardous materials laws, (ii) that all components and equipment of the Premises (including without limitation, the electrical, plumbing, HVAC system, fire sprinklers and the roof) are in good working order, as of the date of delivery of possession of Premises to Guitar Center, (iii) that the Premises are free from any material defects, and (iv) that Landlord has right and title to Premises and the land on which the Premises are constructed, and further has the legal right to lease the same to Guitar Center.

ASSIGNMENT AND SUBLETTING: Landlord expressly permits Existing Tenant to assign the Lease to Guitar Center. Landlord's consent shall be required for any future assignment or sublease by Guitar Center, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that Landlord shall have no approval or consent rights with respect to an assignment or sublease by Guitar Center to an affiliate. Landlord shall not be entitled to any consideration in connection with any future

assignment or sublease. Any assignee or sublessee of Guitar Center shall be permitted to exercise the extension options described above. In the event of an assignment or sublease to a non-affiliate, Guitar Center shall be released from all of its obligations and liability under

Deleted: Five (5) years

Deleted: s

Deleted: Two

Deleted:

Deleted: Five (5) year

Deleted: s

Deleted: INITIAL TERM¶

Deleted: OPTION TERM¶ MONTHLY RENT: . Effective on January 1st of each year of any option term, the Monthly Rent shall increase two and one-half percent (2.5%) over the Monthly Rent payable during the preceding year.¶ .¶



5795 Lindero Canyon Rd., Westlake Village, CA 91362 Phone: (818) 735-8800 Fax: (818)735-7923

the Lease. For purposes of this paragraph, "affiliate" refers to Guitar Center Stores, Inc. or Musician's Friend, Inc.

**HAZARDOUS MATERIALS:**

Guitar Center shall not be responsible for (and Landlord shall indemnify Guitar Center in connection with) any hazardous materials (other than those created by Guitar Center after the date Guitar Center receives possession of the Premises) in or about the Premises.

**LANDLORD'S DEFAULT:**

Landlord shall be deemed in breach of the Lease if Landlord fails within a reasonable time to perform an obligation required to be performed by Landlord, including, without limitation, Landlord's maintenance and repair obligations set forth in Section 9 of the Lease. For purposes of this section, a reasonable time shall in no event be less than thirty (30) days after receipt by Landlord of written notice from Guitar Center specifying wherein such obligation of Landlord has not been performed; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days after such notice are reasonably required for its performance, then Landlord shall not be in breach of the Lease if performance is commenced within such thirty (30) day period and thereafter diligently pursued to completion. In the event of an emergency, any such repairs must be made as soon as practicable after receiving notice from Guitar Center.

**GUITAR CENTER'S REMEDIES:**

In addition to other remedies set forth in the Lease, in the event Landlord is in breach of the Lease beyond any applicable notice and cure periods, and/or fails to perform any terms, covenants, conditions or warranties under the Lease or under applicable law, Guitar Center shall receive one day of abatement of rent for each day such non-performance or non-compliance exists. If such period continues for more than ninety (90) days after written notice from Guitar Center, Guitar Center may at its sole option terminate the Lease by notice to Landlord while reserving all rights which Guitar Center may have for Landlord's default under the Lease. If any repairs required to be made by Landlord pursuant to Section 9 of the Lease are not made within the timeframes set forth above, Guitar Center, at its sole option, shall be permitted to make any such repairs, and offset from rent all costs associated with making such repairs.

**INDEMNIFICATION OF GUITAR CENTER:**

Except for Guitar Center's intentional acts or omissions, gross negligence and/or breach of the Lease, Landlord shall indemnify,

5795 Lindero Canyon Rd., Westlake Village, CA 91362          Phone: (818) 735-8800 Fax: (818)735-7923

protect, defend and hold harmless Guitar Center and its employees, agents, affiliates and representatives, from and against any and all claims, damages, costs, liens, judgments, penalties, permits, attorneys' and consultant's fees, expenses and/or liabilities arising out of, involving, dealing with or resulting from the Landlord's intentional acts or omissions, gross negligence and/or breach of the Lease, or those of its agents, contractors, employes or invitees occurring in or about or resulting from an occurrence in or about the Premises during the term of the Lease or while Guitar Center is in possession of the Premises, or out of default or breach by Landlord in the performance of any representation, warranty or obligation on Landlord's part to be performed under the Lease. The provisions of this Paragraph shall survive termination of the Lease with respect to events occurring prior to such termination.

SNDA:

To the extent that the Premises, or any portion thereof, are subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device, Landlord shall provide Guitar Center with a Subordination, Non-Disturbance Agreement which provides that if Landlord's interest in the Premises is sold or conveyed upon the exercise of any remedy provided in any security device or by deed in lieu thereof, or if the holder of the security device takes possession of the Premises thereto, that for so long as Guitar Center is not in default under the Lease beyond any applicable notice and cure period, Guitar Center's possession and the Lease will not be disturbed and Guitar Center shall be entitled the right of quiet enjoyment.

LANDLORD'S INSURANCE:

Landlord shall obtain and keep in force during the term of the Lease a policy or policies in the name of Landlord, with loss payable to Landlord and Guitar Center and to the holders of any mortgages, deeds of trust or ground leases on the Premises, insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full replacement cost of the Premises.

ANCILLARY DOCUMENTS:

Landlord shall, concurrent with final execution of this letter, submit to Guitar Center copies of all Reciprocal Easement Agreements (REAs); Covenants, Conditions and Restrictions (CCRs); Operation and Easement Agreement (OEAs); prohibited use agreements; Master or Ground Leases, if any; tax and utility bills and statements; and any other documents pertinent to the operation of the Premises, or which may in any way affect Guitar Center's intended use of the Premises.

If the terms of this offer are acceptable to Landlord, please have an authorized representative of Landlord indicate so by signing where indicated below. If you have any questions or comments to the above, please do not hesitate to contact me.

Sincerely,

Leland P. Smith
Executive Vice President
Guitar Center, Inc.

AUTHORIZED SIGNATURE: _____

PRINTED NAME: _____

TITLE: _____

DATE: _____

Page 4 of 4

# EXHIBIT H

# TO ASSET PURCHASE AGREEMENT

(Form of NonCompetition Agreement)

## AGREEMENT NOT TO COMPETE

THIS AGREEMENT NOT TO COMPETE (this "Agreement") is made and entered into as of [_____], 2007, by and between Musician's Friend, Inc., a Delaware corporation ("Purchaser"), and Dennis Bamber ("Seller").

### RECITALS:

A.      Purchaser and the Company have entered into that certain Asset Purchase Agreement Acquisition (the "Purchase Agreement"), dated as of January 30, 2007, pursuant to which Purchaser shall purchase substantially all of the assets, contracts and properties of Dennis Bamber, Inc., d/b/a The Woodwind & The Brasswind (the "Company"), relating to the business of the Company (the "Acquisition").

B.      Purchaser, directly and with its Affiliates, is a retailer of musical instruments with operations existing in, or planned for, all major markets within the United States.

C.      Seller is the majority stockholder of the Company and controls an entity which is the owner of certain real property used by Seller, and will receive personally material financial benefits upon the completion of the transactions contemplated by the Purchase Agreement.

D.      This Agreement is a material inducement to Purchaser's entering into the Purchase Agreement, and Purchaser has relied upon this Agreement in consummating the Acquisition and the other transactions contemplated under the Purchase Agreement.

E.      Unless otherwise defined herein, defined terms used in this Agreement shall have the same meanings as set forth in the Purchase Agreement.

### AGREEMENT:

NOW, THEREFORE, in consideration of the premises, the mutual promises hereinafter set forth, and other good and valuable consideration had and received, the parties hereto agree as follows:

1.      Agreement Not to Compete.

During the Noncompetition Period (as hereinafter defined), Seller shall not in any manner, directly or indirectly, including through entities controlled or managed by Seller, within the Territory (as hereinafter defined), (a) engage or participate in the business of marketing, selling or otherwise providing musical instruments, as well as all other products, parts, accessories, print materials, supplies and services related to such instruments to consumers, students, schools and other educational institutions, whether through the store of Seller, the internet, catalog, mail order, direct response sales or otherwise (collectively, the "Business") or perform services for third parties that are competitive with the Business ("Competitive Services"), or (b) own or operate any business that engages or participates in the Business or that performs Competitive Services other than excluded herein. Seller shall be deemed to be engaged in the Business or performing Competitive Services if Seller shall engage in such business or perform such services directly or indirectly, whether for Seller's own account or for that of another person, firm or corporation, or whether as stockholder, principal, partner, member, agent, investor, proprietor, director, officer, employee or consultant or in any other capacity, except as a consultant or employee to Purchaser or any Affiliate of Purchaser (including without limitation Guitar Center, Inc.). In addition, during the Noncompetition Period, Seller shall not, directly or indirectly, rent, lease, sell, license, contribute or

otherwise transfer or make available (collectively, "Transfer") (a) trademarks, service marks, trade dress, logos, trade names and corporate names or (b) books, records, invoices, documents, ledgers, financial data, files, customer data, reports, product and design manuals, plans, drawings, tax returns, technical manuals, management information systems (including related computer software) related to the Business, in each case to a third party engaged in the Business or that provides Competitive Services (each, a "Transferee") unless, prior to such Transfer, the Transferee enters into an Agreement Not to Compete with Purchaser or an Affiliate of Purchaser in the form of this Agreement. For purposes of this Agreement, the term "Territory" shall mean any area within a 50-mile radius of (a) any facility owned, operated or leased by Purchaser or any subsidiary or other Affiliate of Purchaser (which, for avoidance of doubt, shall include, without limitation, Guitar Center, Inc., a Delaware corporation, and parent of Purchaser ("Guitar Center") and Guitar Center Stores, Inc., a Delaware corporation); (b) any facility owned, operated or leased immediately prior to the consummation of the Acquisition by Seller (each, a "Seller Facility"); (c) any facility resulting from the relocation of a Seller Facility; and (d) any location with respect to which Purchaser or any Purchaser, subsidiary or other Affiliate of Purchaser has, as of the consummation of the Acquisition, executed a lease to establish, or a letter of intent to acquire, a facility. With respect to use of the mail, catalog and Internet, Territory shall mean the entire world. For the purposes of this Agreement, the term "Noncompetition Period" shall mean the period beginning at the consummation of the Acquisition and on the later to occur of (x) nine (9) months after the termination of Seller's status as an employee or consultant with Purchaser or any Affiliate of Purchaser, whether present or future and (y) two (2) years from the date of the consummation of the Acquisition. For the sake of clarity, any period during which Seller is entitled to receive compensation or benefits from Purchaser or any Affiliate thereof under any current or future severance or similar arrangement between Seller and such entity shall not constitute a period of Seller's employment by such entity. Notwithstanding the foregoing provisions of this Section 1, the prohibitions of this Section 1 shall not be deemed to prevent Seller from (a) owning 1% or less of any class of equity securities of an entity that has a class of equity securities registered under Section 12 of the Exchange Act, (b) owning any interest in or marketing, selling , refurbishing or repairing or otherwise providing musical instruments, as well as all other products, parts, accessories, print materials, supplies and services related to such instruments to consumers, students, schools and other educational institutions, whether through a retail store, the internet, catalog, mail order, direct response sales or otherwise in France for fulfillment in France in connection with the store currently known as The Woodwind & The Brasswind of Paris, S.A. (the "Paris Business") provided that (i) in the case of internet, catalog, mail order, and direct response sales, such sales may be made to any place in the world other than the United States so long as the orders are fulfilled from France and (ii) such business is operated under a name that is different from, and not confusingly similar to, any of the trademarks included in the Intellectual Property (including without limitation the Acquired Brands and www.woodbrass.com), (c) marketing, selling , refurbishing or repairing or otherwise providing musical instruments, as well as all other products, parts, accessories, print materials, supplies and services related to such instruments to consumers, students, schools and other educational institutions, whether through a retail store, the internet, catalog, mail order, direct response sales in China for fulfillment in China provided that such business is operated under a name that is different from, and not confusingly similar to, any of the trademarks included in the Intellectual Property (including without limitation the Acquired Brands and www.woodbrass.com), or (d) subject to the terms and conditions of any separate commercial agreement with Purchaser or any Affiliate of Purchaser (including Guitar Center), marketing, selling , licensing, refurbishing or repairing or otherwise providing musical instruments, as well as all other products, parts, accessories, print materials, supplies and services related to such instruments exclusively to resellers (and in no event directly to consumers) in connection with Seller's interest in Barrington Music Products, Inc. ("Barrington") and the trademarks "Barrington" and "L.A. Sax", which are owned by Barrington. For the avoidance of doubt, the exceptions contained in the foregoing clauses (b) and (c) are intended to apply to activities in France (subject to proviso (i) to such clause (b)) and China, respectively, and shall not be construed as an exception applicable to other countries including, without limitation, the United States.

2

2.    Confidential Information; Non-Solicitation.

(a)    Seller acknowledges that Seller has occupied a position of trust and confidence with the Company prior to the date hereof and has become familiar with the following, any and all of which constitute confidential information relating to the Company (collectively, the "Confidential Information"): (i) any and all trade secrets concerning the business and affairs of the Company, product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current and planned research and development, current and planned manufacturing and distribution methods and processes, customer lists, customer information databases, customer mailing lists, current and anticipated customer requirements, price lists, market studies, business plans, computer software and programs (including object code and source code), computer software and data-base technologies, systems, structures and architectures and related processes, formulae, compositions, improvements, devises, know-how, inventions, discoveries, concepts, ideas, designs, methods and information of the Company and any other information, however documented, of the Company or related to the Company that is a trade secret; (ii) any and all information concerning the business and affairs of the Company and the operation of the Business (which includes historical financial statements, financial projections and budgets, historical and projected sales and/or revenues, capital spending budgets and plans, the names and backgrounds of key personnel, the names and backgrounds of acquisition targets, personnel training and techniques and materials), however documented; and (iii) any and all notes, analyses, compilations, studies, summaries, and other material prepared by or for the Company containing or based, in whole or in part, on any information included in the foregoing. For purposes of this Agreement, however, Confidential Information shall not include any of the foregoing that is or becomes generally known to and available for use by the public other than as a result of Seller's fault or the fault of any other Person bound by a duty of confidentiality to Purchaser.

(b)    Seller acknowledges and agrees that all Confidential Information relating to the Business known or obtained by Seller, as of the date hereof, is the sole property of Purchaser. Therefore, Seller agrees that Seller will not, at any time, disclose to any unauthorized Persons or use for Seller's own account or the account of any Affiliate of Seller or for the benefit of any third party any Confidential Information, whether Seller has such information in Seller's memory or embodied in writing or other physical form, without Purchaser's prior written consent (which it may grant or withhold in its sole discretion). If requested by Purchaser, Seller agrees to deliver to Purchaser at the time of execution of this Agreement, and at any other time Purchaser may request, all documents, memoranda, notes, plans records, reports and other documentation, models, components, devices or computer software, whether embodied in a disk or in other form (and all copies of all of the foregoing), relating to the businesses, operations or affairs of the Company or the operation of the Business and any other Confidential Information that Seller may then possess or have under Seller's control.

(c)    During the Noncompetition Period, Seller agrees not to, directly or indirectly, solicit the employment or hire any employee of Seller as of the Closing.

3.    Remedies.

(a)    The necessity of protection against the competition of Seller and the nature and scope of such protection has been carefully considered and agreed upon by the parties hereto. Seller acknowledges that the nature of the Business is highly competitive, that one of the most valuable assets of the Company is its goodwill in the marketplace and among its customers, which Seller helped to develop and maintain in the course of Seller's service to the Company, and that Purchaser, in consummating the Acquisition and entering into the transactions contemplated by the Purchase Agreement, has relied on the fact that it will acquire the goodwill of the Company related to the Business and therefore on Seller's willingness to restrict Seller's ability to compete with Purchaser or any current or future Affiliate of

3

Purchaser in the conduct of the Business. Seller and Purchaser hereby agree and acknowledge that the duration, scope and geographic area applicable to the restrictions set forth in this Agreement are fair, reasonable and necessary.

(b) Seller acknowledges that the consideration provided for in Section 5 hereof is sufficient and adequate to compensate Seller for agreeing to the restrictions contained in this Agreement and that such restrictions will not cause Seller undue hardship. If, however, any court or arbitrator of competent jurisdiction determines that the foregoing restrictions are unreasonable and for that reason unenforceable, such restrictions shall be modified, rewritten or interpreted to include as much of their nature and scope as will render them enforceable. Seller and Purchaser agree that a monetary remedy for a breach of this Agreement will be inadequate and will be impracticable and extremely difficult to prove, and further agree that such a breach would cause Purchaser irreparable harm, and that Purchaser, in addition to any and all other remedies available to it at law or in equity, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages. Seller agrees that Purchaser shall be entitled to such injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions, without the necessity of posting bond or other undertaking in connection therewith. Any such requirement of bond or undertaking is hereby waived by Seller, and Seller acknowledges that in the absence of such a waiver, a bond or undertaking might be required by the court.

4.     <u>Seller Representations and Covenants.</u>

(a) Seller hereby represents and warrants to Purchaser that (a) the execution, delivery and performance of this Agreement by Seller do not and will not conflict with, breach, violate or cause a default under any agreement, contract or instrument to which Seller is a party or any judgment, order or decree to which Seller is subject, (b) Seller has full authority to execute, deliver and be bound by the terms of this Agreement, and (c) upon the execution and delivery of this Agreement by Seller, this Agreement will be a valid and binding obligation of Seller, enforceable in accordance with its terms.

(b) Seller hereby represents and warrants that he does not, in any manner, directly or indirectly, including through entities controlled or managed by Seller, retain, own, possess, use or otherwise control the use anywhere in the world of any Intellectual Property used in the conduct of the Business, including without limitation, (i) the urls www.music123.com or www.wwbw.com or any derivation, misspelling or foreign registration thereof, or (ii) any and all trademark registrations or common law rights involving the names "Music 123" or "The Woodwind & The Brasswind," including, without limitation, any derivation, misspelling or foreign registration thereof, and all associated logos or trade dress used in connection with such names (collectively, the "<u>Acquired Brands</u>"), it being acknowledged that all such Intellectual Property is being conveyed to Purchaser pursuant to the Purchase Agreement; provided, however, that it is acknowledged that the Acquired Brands do not include (i) LA Sax, (ii) Barrington, or (iii) www.woodbrass.com. In the event it is determined that Seller has any interest in Intellectual Property of the sort described in the immediately foregoing sentence, Seller shall promptly notify Purchaser of such in writing and shall execute any and all written agreements as shall reasonably be requested by Purchaser to fully, promptly and completely convey all such interests to Purchaser or its designee. Nothing contained herein shall be construed to constitute a license or other right of Seller to retain any interest in, or use, any of the Acquired Brands or any confusingly similar trademark, it being acknowledged that all such rights have been conveyed to Purchaser, except that (x) the parties specifically agree and stipulate that, as between them, www.woodbrass.com is confusingly similar to The Woodwind and The Brasswind (an Acquired Brand) and (y) Purchaser hereby consents to the use of the url www.woodbrass.com by the Paris Business only if sales connected to such usage are made only within the EU (excluding the UK), all such orders are fulfilled solely from France (the limited consent granted in the immediately foregoing clause (y) shall not in any manner limit the right of the Purchaser to use the Acquired Brands for any purpose and in any geographical region).

4

SW531677.5

5.    Consideration.

Seller hereby acknowledges that as consideration for Seller's covenants set forth in this Agreement, Purchaser has entered into the Purchase Agreement and agreed to enter into lease agreements relating to real property owned by an entity controlled by Seller, and would not have done so but for the agreement of Seller to enter into this Agreement.

6.    Notices.

All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt) provided that a copy is mailed by a nationally recognized overnight delivery service (e.g., Federal Express) or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service, in each case to the appropriate addresses and facsimile numbers set forth below (or to such other addresses and facsimile numbers as a party may designate by notice to the other parties):

If to Purchaser:

Musician's Friend, Inc.
c/o Guitar Center, Inc.
5795 Lindero Canyon Road
Westlake Village, California 91362
Attention:      General Counsel
Telephone:    (818) 735-8800
Facsimile:     (818) 735-4923

*With a copy to*:

Latham & Watkins LLP
140 Scott Drive
Menlo Park, California 94025
Attention:      Anthony J. Richmond
Telephone:    (650) 328-4600
Facsimile:     (650) 463-2600

If to Seller, to the address set forth below Seller's name on the signature page to this Agreement.

7.    Counterparts.

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.    Headings.

The headings herein are for convenience only, and shall not be deemed to limit or affect the interpretation or effect any of the provisions hereof.

SV\531677.5

9.　　Entire Understanding.

This Agreement and the other agreements and instruments incorporated herein constitute the entire agreement and understanding between the parties, and supersede all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof.

10.　　Amendments; Termination.

This Agreement may not be modified or changed except by written instrument signed by each of the parties hereto.

11.　　Governing Law; Dispute Resolution; Waiver of Jury Trial; Service of Process; Consent to Jurisdiction.

(a)　　The execution, performance and interpretation of this Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of [Indiana], without regard to that State's choice of law rules.

(b)　　Any claim or dispute arising out of or related to this Agreement, the interpretation, making performance, breach or termination thereof, shall be finally and exclusively settled by binding arbitration to be held in Chicago, Illinois. The arbitration shall be made in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association and such arbitration shall be conducted by an arbitrator chosen by mutual agreement of Purchaser and Seller; failing such agreement, the arbitration shall be conducted, by three independent arbitrators, one chosen by Purchaser, one chosen by Seller, and such two arbitrators shall mutually select a third arbitrator, with any decision of two such arbitrators shall be binding. The arbitrator(s) shall have the authority to grant any equitable and legal remedies that would be available in any judicial proceeding instituted in Chicago, Illinois to resolve the dispute. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The parties expressly waive all rights whatsoever to file an appeal against or otherwise to challenge any award by the arbitrator(s) hereunder, provided that the foregoing shall not limit the rights of either party to bring a proceeding in any applicable jurisdiction to conform, enforce or enter judgment upon such award (and the rights of the other party, if such proceeding is brought, to contest such confirmation, enforcement or entry of judgment).

(c)　　EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (II) SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (III) SUCH PARTY MAKES SUCH WAIVERS VOLUNTARILY, AND (IV) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11(c).

SV\531677.5

12.     Construction.

Whenever in this Agreement the context so requires, references to the masculine shall be deemed to include feminine and the neuter, references to the neuter shall be deemed to include the masculine and feminine, and references to the plural shall be deemed to include the singular and the singular to include the plural.

13.     Cooperation.

Each party hereto shall cooperate with the other party and shall take such further action and shall execute and deliver such further documents as may be necessary or desirable in order to carry out the provisions and purposes of this Agreement.

14.     Waiver.

Seller or Purchaser may, by written notice to the other: (a) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement or in any document delivered pursuant to this Agreement; (b) waive compliance with any of the covenants of the other party contained in this Agreement; or (c) waive or modify performance of any of the obligations of the other party. No action taken pursuant to this Agreement shall be deemed to constitute a waiver by the party taking such action, possessing such knowledge or performing such investigation of compliance with the representations, warranties, covenants and agreements contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be constituted as a waiver of any subsequent breach. The failure of any party to insist, in any one or more instances, upon performance of any of the terms, covenants or conditions of this Agreement shall not be construed as a waiver or relinquishment of any rights granted hereunder or any such term, covenant or condition.

15.     **Full Understanding; Negotiation of Agreement.**

(a)     Seller represents that Seller has carefully read and fully understands all of the provisions of this Agreement, that Seller is competent to execute this Agreement, that Seller's agreement to execute and deliver this Agreement has not been obtained by any duress and that Seller freely and voluntarily enters into it, and that Seller has read this Agreement in its entirety and fully understands the meaning, intent and consequences of this Agreement.

(b)     Each of the parties hereto acknowledges that it has been represented by independent counsel of its choice, or has had the opportunity to be represented by independent counsel of its own choosing, and that to the extent, if any, that it desired, each party hereto availed itself of this right and opportunity throughout all negotiations that have preceded the execution of this Agreement, and that it has executed the same with the consent and upon the advice of said independent counsel. Each party hereto and its counsel cooperated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto shall be deemed the work product of the parties and may not be construed against any party by reason of its preparation. Accordingly, any rule of law, or any legal decision that would require interpretation of any ambiguities in this Agreement against the party that drafted it, is of no application and is hereby expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intentions of the parties and this Agreement.

16.     Parties in Interest; Assignment.

This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective permitted successors, assigns, heirs and/or personal representatives, except that neither this Agreement nor any interest herein shall be assigned or assignable by operation of law or otherwise by Seller without the prior written consent of Purchaser. Nothing in this Agreement, expressed or implied, is intended to confer on any person other than the parties and their respective successors and permitted assigns any rights or remedies under or by reason of this Agreement.

17.     Severability.

In the event that, notwithstanding the express, carefully considered, agreement of Purchaser and Seller set forth herein, any provision of this Agreement shall be deemed invalid, unenforceable or illegal, or if the period during which this Agreement is to remain effective is found to exceed the legally permissible period, then notwithstanding such invalidity, unenforceability or illegality the remainder of this Agreement shall continue in full force and effect during the maximum period legally permissible (subject to any reformation of terms as provided for in Section 3).

18.     Attorneys' Fees.

If any party to this Agreement brings an action to enforce its rights under this Agreement in accordance with the provisions hereof (including, without limitation, rights under Section 11 hereof), the prevailing party shall be entitled to recover its actual out-of-pocket costs and expenses, including without limitation attorneys' fees and court costs reasonably incurred in connection with such action, including any appeal of such action.

(Signature Page Follows)

SV\531677.5

8

IN WITNESS WHEREOF, the parties hereto have executed this Agreement Not to Compete as of the date first written above.

PURCHASER:

MUSICIAN'S FRIEND, INC.

By:_____
Name:_____
Title:_____


SELLER:

_____

Address:   _____
           _____
           _____

[Signature Page to Agreement Not to Compete]

# EXHIBIT I

# TO ASSET PURCHASE AGREEMENT

(Material Terms of Barrington/LA Sax Agreement)

Exhibit I

## SUMMARY OF TERMS AND CONDITIONS
## FOR COMMERCIAL AGREEMENT AND TRADEMARK LICENSE

The following terms and conditions summarize the material terms of a proposed commercial agreement and trademark license between Musician's Friend, Inc., a Delaware corporation ("MFI"), and Barrington Music Products, Inc ("Barrington"), an Indiana corporation. This letter and any contract or amendment executed in connection herewith shall become effective only following the closing of the acquisition of the principal assets of Dennis Bamber, Inc., d/b/a The Woodwind and The Brasswind, by MFI (the "Acquisition").

| | |
|---|---|
| TERM: | Five (5) years from the effective date of the closing of the Acquisition |
| AUTO RENEWAL: | Automatic annual renewals for an additional year, unless Barrington provides at least twelve months prior written notice of its intention to terminate the agreement. If at the time of such termination, MFI has in its possession more than nine months supply of product at ordinary sales rates, then the termination date shall be extended to the date that is reasonably expected to be no earlier than three months after the supply of product held by MFI is substantially sold out in the ordinary course of business. Barrington shall not permit any other dealer to resell, or indicate that it is authorized to resell, new product under the Barrington brand name while this agreement is in effect. |
| BARRINGTON BRAND: | Barrington owns the "Barrington" trademark as applicable to musical instruments and related products and services. MFI and any other affiliate of Guitar Center, Inc. ('GCI') shall have the exclusive right (but not the obligation) to purchase from Barrington musical instrument products under the Barrington brand for resale in their business. The sale of product from Barrington to MFI and any such affiliates shall be on terms consistent with historical sales to DBI. Barrington confirms that historically the Barrington brand has been a proprietary brand retailed solely by DBI. |
| LA SAX BRAND: | Barrington owns the "LA Sax" trademark as applicable to musical instruments and related products and services. MFI and any other affiliate of GCI shall have the right (but not the obligation) to purchase from Barrington or its independent distributor musical instrument products under the LA Sax brand for resale in their business. The sale of product from Barrington or its distributor to MFI and any such affiliates shall be on terms consistent with historical sales to DBI and, in any event, no less favorable than the terms provided to any other reseller of LA Sax products purchasing a comparable volume of product. Barrington confirms that historically the LA Sax brand has not been exclusive to DBI, but has also been marketed by other resellers. |

TRADEMARK LICENSE:   MFI and the other affiliates of GCI shall be the beneficiary of an appropriate trademark license in order to permit the marketing of the Barrington and LA Sax products as contemplated by this agreement.

PURCHASE RIGHT:   In the event that Barrington considers the sale of, or a grant of an exclusive license in respect of, either the Barrington trademark and/or the LA Sax trademark, whether directly, indirectly through the sale of stock, or otherwise, MFI shall have an opportunity to purchase such trademarks by matching any such offer.

GCi COMPANY POLICY:   GCI's corporate policy prohibits any employee or consultant from having an interest in a vendor. GCI will suspend that policy for one year from Closing. After such one year period, each of Dennis Bamber and David Yoder will either have to divest their interest in Barrington, or voluntarily resign from any employment or consulting position with GCI or any of its affiliates.

If the terms of this offer are acceptable to Barrington, please have an authorized representative of Barrington indicate so by signing where indicated below. If you have any questions or comments to the above, please do not hesitate to contact me.

Sincerely,

Craig Johnson
President
Musicians Friend, Inc.

AUTHORIZED SIGNATURE: _____

PRINTED NAME: _____

TITLE: _____

DATE: _____

SV\533221.2  Binding Term Sheet for Barrington and LA Sax

# DISCLOSURE SCHEDULES

# TO ASSET PURCHASE AGREEMENT

DISCLOSURE SCHEDULE

TO ASSET PURCHASE AGREEMENT
BY AND BETWEEN
MUSICIAN'S FRIEND, INC.
AND
DENNIS BAMBER, INC., D/B/A THE WOODWIND & THE BRASSWIND,
AND
ITS CHAPTER 11 ESTATE

DATED AS OF JANUARY 30, 2007

## INTRODUCTION

The following is the Disclosure Schedule referred to in that certain Asset Purchase Agreement dated as of January 30, 2007 (the "Purchase Agreement") between Musician's Friend, Inc. ("Purchaser") and Dennis Bamber, Inc., d/b/a The Woodwind & The Brasswind, and its Chapter 11 Estate ("Seller"). Capitalized terms used and not defined herein shall have the meanings assigned thereto in the Purchase Agreement.

No reference to or disclosure of any item or other matter in this Disclosure Schedule will be construed as an admission or indication that such item or matter is material, did not arise in the ordinary course of business or is required to be referred to or disclosed in this Disclosure Schedule. Nothing in this Disclosure Schedule relating to any possible breach or violation of any agreement, law or regulation will be construed as an admission or indication that any such breach or violation exists or has actually occurred.

This Disclosure Schedule and the information and disclosures contained herein are intended only to qualify and limit the representations, warranties and covenants of Seller contained in the Purchase Agreement and will not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants.

1

Section 1.1(a) of the Disclosure Schedule

**Excluded Assets**

Dennis Bamber's personal artwork in his office.

<u>Trademarks owned by Barrington Music Products, Inc., not the Seller:</u>

"L.A. Sax"
"Barrington"

Buyer acknowledges that the business currently operated as The Woodwind & The Brasswind of Paris, S.A. ("Paris"), for which Dennis Bamber is the majority shareholder and not by the Seller and is not part of the Transferred Assets except for one share of Paris' capital stock owned by Seller.  Buyer also acknowledges that the domain name woodbrass.com is owned by Paris (subject, from and after Closing, to the limitations contained in the Noncompete Agreement).

## Section 1.1(b) of the Disclosure Schedule

### Permitted Encumbrances

With respect to the rights of the Seller and its chapter 11 estate under Contracts included in the Transferred Assets, such rights are subject to the claims and rights of the respective third parties to the extent that: (a) the Contracts are executory contracts and not subject to assumption and/or assignment under the Bankruptcy Code, or otherwise not assignable by applicable law; or (b) the Contracts are not executory contracts and the rights thereunder are not assignable by their respective terms or by applicable law.

With respect to the rights of the Seller and its chapter 11 estate in Inventory which is subject to a purchase money security interest, any such inventory may be subject to a lien superior to LaSalle Bank National Association. At the Closing, the Transferred Assets including any and all inventory subject to purchase money security interests, shall be sold free and clear of interests to the fullest extent allowed by law, with such interests attaching to the proceeds of the sale pursuant to Section 363 of the Bankruptcy Code.

Permitted Encumbrances also include: liens for Taxes not yet due and payable or due but not delinquent or being contested in good faith and by appropriate proceedings; landlord's Encumbrances; statutory liens that were created in the ordinary course of business; restrictions or rights granted or required to be granted to Governmental Bodies or otherwise imposed by Governmental Bodies under applicable law; zoning, building or similar restrictions relating to or affecting the Leased Real Property that do not prohibit in any material respect the use of the Leased Real Property as currently used by Seller; and the Assumed Liabilities.

Secured Parties Pursuant to Current UCC Financing Statements:
LaSalle Bank National Association
LaSalle National Leasing Corp
Dennis R. Bamber
Gibson Guitar Corp
Yamaha Corporation of America
G. Leblanc Corporation
Taylor-Listug, Inc. (Taylor Guitars)
Guitabec d/b/a Godin Guitars
Key Corp. Leasing
Fender Musical Instrument Corp. (contested - incorrect debtor name)

Other:
David Carpenter pursuant to the Security Agreement dated April 28, 2005 with Seller.

3

Section 2.1(c) of the Disclosure Schedule

## Contracts

(i)   Proprietary Products:   Valdesta; Keytech; Mainline; Baja; Bellafina; Fullerton; Allora; Vienna; Woodwind; Brasswind; Barrington; BandNow; Florea; Karl Wilhelm; Ren Wei Shi; Londoner; Premiere; Arcolla; Drum Wind; Drums in the Wind; Verve; Mainline Audio; Grime Gutter: Adesso; Jo-Ral; Jet-Tone; Wolfpak; and Pinnacle.  The total open purchase orders for proprietary products as of the date of execution of the Agreement is not more than $700,000 in the aggregate.

(ii)  See Section 3.6(a) of the Disclosure Schedule for Executory Contracts.